NANCY SHER COHEN (State Bar No. 81706)
  Nancy.Cohen@LathropGPM.com
RONALD A. VALENZUELA (State Bar No. 210025)
  Ronald.Valenzuela@LathropGPM.com
LATHROP GPM LLP
1888 Century Park East, Suite 1000
Los Angeles, CA 90067
Telephone: (310) 789-4600
Facsimile: (310) 789-4601

Attorneys for Plaintiffs
[See List of Plaintiffs, attached as Exhibit A]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARCONIC INC.; MACOM CONNECTIVITY SOLUTIONS, LLC (f/k/a APPLIED MICRO CIRCUITS CORPORATION); BASF CORPORATION; BAXTER HEALTHCARE CORPORATION; C. T. L. PRINTING INDUSTRIES, INC.; CALIFORNIA HYDROFORMING COMPANY, INC.; COLUMBIA SHOWCASE & CABINET COMPANY, INC.; CROSBY & OVERTON, INC.; DISNEY ENTERPRISES, INC.; FHL GROUP; FORENCO, INC.; GENERAL DYNAMICS CORPORATION; HERCULES LLC (f/k/a HERCULES INCORPORATED); HEXCEL CORPORATION; HONEYWELL INTERNATIONAL INC.; INTERNATIONAL PAPER COMPANY; LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY; MASCO BUILDING PRODUCTS CORPORATION; MATTEL, INC.; MERCK SHARP & DOHME CORP.; PILKINGTON GROUP LIMITED; QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC.; RAYTHEON COMPANY; SAFETY-KLEEN SYSTEMS, INC.; SOCO WEST, INC.; SPARTON TECHNOLOGY, INC.; THE BOEING COMPANY; THE DOW CHEMICAL COMPANY; TRIMAS CORPORATION; AND UNIVAR SOLUTIONS USA INC., <br><br> Plaintiffs, | Case No.: 2:20-cv-02586 <br><br> **COMPLAINT** <br><br> 1. Contribution; Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9601, *et seq.*; <br> 2. Declaratory Judgment For Contribution |

1          v.

2

3

4

5
CAL-TRON PLATING, INC.; DENNIS
6   O'MEARA; ELECTRONIC CHROME &
GRINDING CO., INC.; DUNCAN
7   INDUSTRIES, INC.; HALLIBURTON
ENERGY SERVICES, INC.; MID-WEST
8   FABRICATING CO.; OMEGA CHEMICAL
CORPORATION; SANTA FE RUBBER
9   PRODUCTS, INC.; SUNRISE
PROPERTIES, LLC; AND VANOWEN
10   HOLDINGS, LLC; AND DOES 1 – 10,
INCLUSIVE,

11

12                  Defendants.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Plaintiffs Arconic Inc.; MACOM Connectivity Solutions, LLC (formerly

2  known as Applied Micro Circuits Corporation); BASF Corporation; Baxter

3  Healthcare Corporation; C. T. L. Printing Industries, Inc. (formerly known as

4  Cal-Tape & Label Co.); California Hydroforming Company, Inc.; Columbia

5  Showcase & Cabinet Company, Inc.; Crosby & Overton, Inc.; Disney Enterprises,

6  Inc.; FHL Group; Forenco, Inc.; General Dynamics Corporation; Hercules LLC

7  (formerly known as Hercules Incorporated); Hexcel Corporation; Honeywell

8  International Inc.; International Paper Company; Los Angeles County Metropolitan

9  Transportation Authority; Masco Building Products Corporation (formerly known as

10  Masco Corporation of Indiana); Mattel, Inc.; Merck Sharp & Dohme Corp.;

11  Pilkington Group Limited; Quest Diagnostics Clinical Laboratories, Inc.; Raytheon

12  Company; Safety-Kleen Systems, Inc.; Soco West, Inc.; Sparton Technology, Inc.;

13  The Boeing Company; The Dow Chemical Company; TriMas Corporation; and

14  Univar Solutions USA Inc. (formerly known as Univar USA Inc.) (collectively,

15  "Plaintiffs"), by their attorneys, Lathrop GPM LLP, against Defendants Cal-Tron

16  Plating, Inc.; Electronic Chrome & Grinding Co., Inc.; Duncan Industries, Inc.;

17  Dennis O'Meara; Halliburton Energy Services, Inc.; Mid-West Fabricating Co.;

18  Omega Chemical Corporation; Santa Fe Rubber Products, Inc.; Sunrise Properties,

19  LLC; and Vanowen Holdings, LLC and DOES 1 through 10 (collectively,

20  "Defendants"), allege upon knowledge as to themselves and upon information and

21  belief as to others, the following:

22  **NATURE OF THE ACTION**

23  1.  This is a civil action arising from environmental contamination caused

24  by Defendants and by which Plaintiffs seek contribution and a declaratory judgment

25  under sections 113(f) and 113(g)(2) of the federal Comprehensive Environmental

26  Response, Compensation and Liability Act, as amended 42 U.S.C. §§ 9601-9675

27  ("CERCLA").

28

2.    Groundwater underlying portions of the Whittier and Santa Fe Springs communities is contaminated with high concentrations of numerous substances that are hazardous to the environment and human health, including hexavalent chromium and chlorinated and non-chlorinated solvents.  According to the United States Environmental Protection Agency ("EPA"), action to address the contamination is necessary to protect public health and the environment.  EPA has designated this regional groundwater contamination as Operable Unit No. 2 of the Omega Superfund Site ("OU-2") and has generally defined it as "the contamination in groundwater generally downgradient of the Omega Property, much of which has commingled with chemicals released at other locations into a regional plume containing multiple contaminants . . . ."  By "Omega Property," EPA means the property formerly owned by Defendant Omega Chemical Corporation, encompassing approximately one acre, located at 12504 and 12512 E. Whittier Boulevard, Whittier, California, which, for purposes of this complaint, Plaintiffs have defined in Paragraph 142 below as the Omega Chemical Source Property.

3.    For decades, Defendants have owned properties or operated businesses that sit atop or very near OU-2 at which substantial quantities of hazardous substances and waste, including chlorinated and non-chlorinated solvents and hexavalent chromium, have been spilled or discharged onto the ground and migrated into the soil and OU-2 groundwater.  These businesses include chemical manufacturing or processing plants, businesses that perform mechanical repair and maintenance work on automobiles, manufacturing plants, metal processing plants, and plating shops. The soil and groundwater underlying these source properties have been contaminated by operations conducted there, resulting in multiple sources of contamination that have contributed to the OU-2 contamination (hereinafter, referred to individually as a "Source Property" and, collectively, the "Source Properties").  EPA has evaluated several Defendants in connection with OU-2 and has concluded that certain of them

1   are potentially responsible parties ("PRPs"), as that term is understood under

2   CERCLA.

3       4.    Plaintiffs, or their predecessors, affiliated entities, assignees or obligees,

4   are a subset of numerous companies that allegedly sent chemicals to Omega Chemical

5   Corporation in Whittier for appropriate processing and recycling.  EPA contends that

6   Omega Chemical Corporation failed to properly process, recycle or dispose of those

7   chemicals, resulting in groundwater contamination and released hazardous

8   substances from facility operations into the groundwater.  EPA also contends that

9   companies that sent chemicals to Omega Chemical Corporation for processing, along

10  with others that have contributed to the OU-2 groundwater contamination, should

11  contribute to the response costs incurred to address that contamination.

12      5.    Plaintiffs have each voluntarily incurred significant costs to investigate

13  the sources to, and the remediation of, OU-2, collectively spending millions of dollars

14  to address it.  As more fully alleged below in Paragraph 60, Plaintiffs will incur

15  millions of dollars more in future response costs to implement a consent decree

16  between Plaintiffs and the state and federal governments to address the OU-2

17  contamination and to reimburse those governments for certain response costs.  Upon

18  information and belief, Defendants are responsible for releases of hazardous

19  substances to the OU-2 groundwater and therefore should contribute to the costs

20  arising from that consent decree.

21      6.    By this action, Plaintiffs seek to recover from Defendants the necessary

22  costs of response that Plaintiffs have incurred and will continue to incur in a manner

23  consistent with the National Contingency Plan ("NCP"), 40 C.F.R. Part 300 *et seq.*,

24  caused by the release or threatened release of hazardous substances that have

25  contaminated the OU-2 groundwater and that exceed Plaintiffs' equitable share of

26  those costs.  Plaintiffs also seek a declaratory judgment that Defendants are liable for

27  contributing to future response costs or damages that will be binding on any

28  subsequent actions to recover further response costs or damages.

**PARTIES**

A.    **Plaintiffs**

7.    Plaintiff Arconic Inc. is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Pittsburgh, Pennsylvania.

8.    Plaintiff MACOM Connectivity Solutions, LLC (f/k/a Applied Micro Circuits Corporation) is a limited liability company duly organized and existing under the laws of the state of Delaware with its principal place of business in Lowell, Massachusetts.

9.    Plaintiff BASF Corporation is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Florham Park, New Jersey.

10.    Plaintiff Baxter Healthcare Corporation is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Deerfield, Illinois.

11.    Plaintiff C. T. L. Printing Industries, Inc. (formerly known as Cal-Tape & Label Co.) is a corporation duly organized and existing under the laws of the State of California with its principal place of business in Anaheim, California.

12.    Plaintiff California Hydroforming Company, Inc. is a corporation duly organized and existing under the laws of the State of California with its principal place of business in City of Industry, California.

13.    Plaintiff Columbia Showcase & Cabinet Company, Inc. is a corporation duly organized and existing under the laws of the State of California with its principal place of business in Sun Valley, California.

14.    Plaintiff Crosby & Overton, Inc. is a corporation duly organized and existing under the laws of the State of California with its principal place of business in Long Beach, California.

15.    Plaintiff Disney Enterprises, Inc. is a corporation duly organized and

- 4 -

existing under the laws of the State of Delaware with its principal place of business in Burbank, California.

16.     Plaintiff FHL Group is a corporation duly organized and existing under the laws of the State of California with its principal place of business in Palos Verdes Estates, California.

17.     Plaintiff Forenco, Inc. is a corporation duly organized and existing under the laws of the State of Illinois with its principal place of business in Chicago, Illinois.

18.     Plaintiff General Dynamics Corporation is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Reston, Virginia.

19.     Plaintiff Hercules LLC (formerly known as Hercules Incorporated) is a limited liability company duly organized and existing under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware.

20.     Plaintiff Hexcel Corporation is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Stamford, Connecticut.

21.     Plaintiff Honeywell International Inc. is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Morristown, New Jersey.

22.     Plaintiff International Paper Company is a corporation duly organized and existing under the laws of the State of New York with its principal place of business in Memphis, Tennessee.

23.     Plaintiff Los Angeles County Metropolitan Transportation Authority is a public corporation, transit district and county transportation commission, duly authorized by California law to plan, construct and operate public mass transit in the County of Los Angeles.

24.     Plaintiff Mattel, Inc. is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in El Segundo, California.

25.     Plaintiff Masco Building Products Corporation (formerly known as Masco Corporation of Indiana) is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Taylor, Michigan.

26.     Plaintiff Merck Sharp & Dohme Corp. is a corporation duly organized and existing under the laws of the State of New Jersey with its principal place of business in Whitehouse Station, New Jersey.

27.     Plaintiff Pilkington Group Limited, formerly known as Pilkington PLC, is a private limited company duly organized and existing under the laws of England with its principal place of business in Lathom, England.

28.     Plaintiff Quest Diagnostics Clinical Laboratories, Inc. is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Secaucus, New Jersey.

29.     Plaintiff Raytheon Company is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Waltham, Massachusetts.

30.     Plaintiff Safety-Kleen Systems, Inc. is a corporation duly organized and existing under the laws of the State of Wisconsin with its principal place of business in Norwell, Massachusetts.

31.     Plaintiff Soco West, Inc. is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Stamford, Connecticut.

32.     Plaintiff Sparton Technology, Inc. is a corporation duly organized and existing under the laws of the New Mexico with its principal place of business in Schaumberg, Illinois.

33.     Plaintiff The Boeing Company is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Chicago, Illinois.

34.     Plaintiff The Dow Chemical Company is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Midland, Michigan.

35.     Plaintiff TriMas Corporation is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Bloomfield Hills, Michigan.

36.     Plaintiff Univar Solutions USA Inc. (formerly known as Univar USA Inc.) is a corporation duly organized and existing under the laws of the State of Washington with its principal place of business in Downers Grove, Illinois.

**B.    Defendants**

**1.     Cal-Tron Plating**

37.     Defendant Cal-Tron Plating, Inc. ("Cal-Tron") is a corporation duly organized and existing under the laws of the State of California with its principal place of business in Santa Fe Springs, California.  As alleged more fully herein, Cal-Tron is a current or previous "owner" or "operator," as those terms are defined under CERCLA, of the Cal-Tron Plating Source Property, as that term is defined below in Paragraph 66.

**2.     Electronic Chrome**

38.     Defendant Electronic Chrome & Grinding Co., Inc. is a corporation duly organized and existing under the laws of the State of California with its principal place of business in Santa Fe Springs, California.  Upon information and belief, Electronic Chrome & Grinding Co., Inc. is a successor-in-interest to and/or was formerly known as, Electronic Chrome Co., Inc.  Hereafter, Electronic Chrome & Grinding Co., Inc. and Electronic Chrome Co., Inc. are referred to collectively as "Electronic Chrome."  As alleged more fully herein, Electronic Chrome is a current or

- 7 -

1    previous "owner" or "operator," as those terms are defined under CERCLA, of the

2    Electronic Chrome Source Property, as that term is defined below in Paragraph 79.

3            **3.      Sunrise Properties**

4            39.     Defendant Sunrise Properties, LLC ("Sunrise") is a limited liability

5    company duly organized and existing under the laws of the State of California with its

6    principal place of business in Los Angeles, California.  As alleged more fully herein,

7    Sunrise is a current or previous "owner" or "operator," as those terms are defined

8    under CERCLA, of the Sunrise Source Property, as that term is defined below in

9    Paragraph 90.

10           **4.      Mid-West Fabricating**

11           40.     Defendant Mid-West Fabricating Co. is a corporation duly organized

12   and existing under the laws of the State of Ohio with its principal place of business in

13   Amanda, Ohio.  Upon information and belief, Mid-West is a successor-in-interest to

14   Tri-Angle Tool & Machine Works, Inc. and to West Bent Bolt, and/or it operates

15   under the name of, and/or operates a division under the name of, West Bent Bolt.

16   Hereafter, Mid-West Fabricating Co., West Bent Bolt, and Tri-Angle Tool &

17   Machine Works, Inc. are collectively referred to as "Mid-West." As alleged more

18   fully herein, Mid-West is a current or previous "owner" or "operator," as those terms

19   are defined under CERCLA, of the Mid-West Fabricating Source Property, as that

20   term is defined below in Paragraph 104.

21           **5.      Santa Fe Rubber**

22           41.     Defendant Santa Fe Rubber Products, Inc. is a corporation duly

23   organized and existing under the laws of the State of California with its principal

24   place of business in Whittier, California.  Upon information and belief, Santa Fe is a

25   successor-in-interest to Santa Fe Holding Corporation.  Hereafter, Santa Fe Rubber

26   Products, Inc. and Santa Fe Holding Corporation are collectively referred to as "Santa

27   Fe Rubber."  As alleged more fully herein, Santa Fe Rubber is a current or previous

28

"owner" or "operator," as those terms are defined under CERCLA, of the Santa Fe Rubber Source Property, as that term is defined below in Paragraph 117.

### 6.   Halliburton Energy

42.   Defendant Halliburton Energy Services, Inc. is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Houston, Texas.  Upon information and belief, Halliburton is a successor-in-interest to, and/or was formerly known as, Halliburton Company and is the successor-in-interest to Halliburton Equipment Company, Otis Engineering Corp. and Welex, Inc.  Hereafter, Halliburton Energy Services, Inc., Halliburton Equipment Company, Otis Engineering Corp. and Welex, Inc. Company are collectively referred to as "Halliburton."  As alleged more fully herein, Halliburton is a current or previous "owner" or "operator," as those terms are defined under CERCLA, of the Halliburton Energy Source Property, as that term is defined below in Paragraph 124.

### 7.   Duncan Industries

43.   Defendant Duncan Industries, Inc. ("Duncan") is a corporation duly organized and existing under the laws of the State of California with its principal place of business in Santa Fe Springs, California. As alleged more fully herein, Duncan is a current or previous "owner" or "operator," as those terms are defined under CERCLA, of the Duncan Source Property, as that term is defined below in Paragraph 135.

### 8.   Omega Chemical Source Property Defendants

44.   Defendant Vanowen Holdings, LLC ("Vanowen") is a limited liability company duly organized and existing under the laws of the State of California with its principal place of business in Los Angeles, California.  As alleged more fully herein, Vanowen is a current or previous "owner" or "operator," as those terms are defined under CERCLA, of the Omega Chemical Source Property, as that term is defined below in Paragraph 142.

45.     Defendant Omega Chemical Corporation is a suspended corporation organized and existing under the laws of the State of California with its principal place of business in Whittier, California.  According to the California Secretary of State, Omega Chemical Corporation was suspended or forfeited by the Franchise Tax Board for failure to meet tax requirements.  Upon information and belief, Omega Chemical Corporation is a successor-in-interest to, and/or was previously known as, the James B. Bachelor Chemical Processing Co., and/or Bachelor Chemical Processing Company.  Plaintiffs are informed and believe that Omega Chemical Corporation is a predecessor-in-interest to Omega Recovery Services Corporation, a California suspended corporation with its principal place of business in Whittier, California.  Hereafter, Omega Chemical Corporation, Omega Recovery Services, and James B. Bachelor Chemical Processing Co. are collectively referred to as "Omega Chemical."  As alleged more fully herein, Omega Chemical is a current or previous "owner" or "operator," as those terms are defined under CERCLA, of the Omega Chemical Source Property.

46.     Defendant Dennis O'Meara is an individual who, upon information and belief, resides in Irwindale, California.  At all times relevant herein, Dennis O'Meara was the president, chief executive officer, and majority, if not sole, shareholder of Omega Chemical.  As alleged more fully herein, Dennis O'Meara is a current or previous "owner" or "operator," as those terms are defined under CERCLA, of Omega Chemical.

**C.     Doe Defendants**

47.     Plaintiffs are ignorant of the true names and capacities of the defendants sued fictitiously as DOES 1 through 5, inclusive, and therefore sue these defendants by such fictitious names.  Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained, but are presently informed and believe that each of the fictitiously named defendants is an owner, member, or affiliate of a named Defendant with such unity of interest and ownership that the separate personalities

- 10 -

between the Doe Defendant and the named Defendant no longer exist and that failure to disregard their separate identities would result in fraud or injustice.

48.     Plaintiffs are ignorant of the true names and capacities of the defendants sued fictitiously as DOES 6 through 10, inclusive, and therefore sue these defendants by such fictitious names.  Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained, but are presently informed and believe that each of the fictitiously named defendants is a person or entity that arranged for the disposal of hazardous substances at a Source Property, which is responsible in some manner for some or all of the acts alleged herein.

## JURISDICTION AND VENUE

49.     This is a civil action arising under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* This Court has original jurisdiction pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1331.

50.     In addition, the Declaratory Judgments Act, 28 U.S.C. §§ 2201, 2202, and Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), authorize this Court to grant Plaintiffs declaratory relief.

51.     Venue is proper in this district pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), because the releases of hazardous substances and endangerment to health and environment which give rise to the claims asserted herein occurred in this district.

## FACTUAL ALLEGATIONS

### A.     OU-2 Regional Groundwater Contamination

52.     EPA has concluded that the groundwater in OU-2 is contaminated with hazardous substances above background levels.  The chemicals in the groundwater include but are not limited to:

- Antimony;
- Arsenic;

1    • Benzene;

2    • Chloroform;

3    • Chromium;

4    • Hexavalent chromium;

5    • Total chromium;

6    • 1,2-Dibromo-3-chloropropane ("DBCP");

7    • 1,1-Dichloroethane ("1,1-DCA");

8    • 1,2-Dichloroethane ("1,2-DCA);

9    • 1,1-Dichloroethene ("1,1-DCE");

10   • Cis-1,2-dichloroethene ("c-1,2-DCE");

11   • Methylene chloride ("DCM");

12   • Cis-1,3-dichloropropene ("c-1,3-DCP");

13   • Trans-1,3-dichloropropene ("t-1,3-DCP");

14   • Bis (2-ethylhexyl) phthalate ("DEHP");

15   • 1,4-Dioxane;

16   • 1,2-Dibromoethane ("EDB");

17   • Carbon tetrachloride;

18   • Trichlorofluoromethane ("Freon 11");

19   • 1,1,2-Trichloro-1,2,2-trifluoroethane ("Freon 113");

20   • Isopropyl alcohol ("IPA");

21   • Manganese;

22   • Mercury;

23   • Methyl tert-butyl ether ("MTBE");

24   • N-nitrosodimethylamine ("NDMA");

25   • Naphthalene;

26   • Nickel;

27   • 1,1,2,2-Tetrachloroethane;

28   • Tetrachloroethylene ("PCE");

- Selenium;
- 1,1,1-Trichloroethane ("1,1,1-TCA");
- 1,1,2-Trichloroethane ("1,1,2-TCA");
- Trichloroethylene ("TCE");
- Thallium;
- Toluene; and
- Vinyl chloride.

Each of these substances is a "hazardous substance" as that term is defined under CERCLA. EPA contends that exposure to one or more of these substances at levels present in OU-2 poses a risk to human health and safety.

53. Historically, the land that sits atop OU-2 has been used mostly for industrial or commercial purposes. The area includes chemical manufacturing and processing plants, oil refinery and oil production facilities, including wells and pipelines, industrial laundry operations, metal processing and heat treating plants, railroad operations, gas stations, automobile repair and maintenance shops, and machine shops, many of which involved storage of significant quantities of chemicals for use in operations.

54. Certain Defendants currently operate, or formerly operated, such businesses, or currently own, or formerly owned, the property on which those businesses operated.

55. State and federal governmental entities have identified some of the properties owned by Defendants, or upon which they operated, as well as the Omega Chemical Source Property, as sources or potential sources of the OU-2 groundwater contamination. They have identified numerous instances of releases of hazardous substances, such as PCE, TCE, and hexavalent chromium, onto the ground and into the soil at and underneath those properties.

56. State and federal governmental entities also believe that the subsurface directly beneath these source areas consists of portions of permeable soil containing

1    lower concentrations of water, resulting in migration of contaminants generally

2    downward by gravity.  As the contaminants in the soil sink to lower depths and reach

3    the saturated zone, the contaminants travel laterally and downgradient with the flow

4    of the groundwater.

5        57.    Beginning no later than 2009, each Plaintiff has incurred significant

6    costs to monitor, assess and evaluate OU-2, to investigate the environmental

7    conditions associated with OU-2, including the sources of contamination, to identify

8    PRPs, and to evaluate the means to address the contamination.  Plaintiffs collectively

9    have incurred millions of dollars to date in such costs.  These costs have neither been

10   reimbursed nor indemnified by Defendants, nor are they duplicative of any costs

11   incurred by any other person, entity, or governmental entity in connection with OU-2.

12   **B.    The OU-2 Consent Decree**

13       58.    Plaintiffs are members of an unincorporated association of public and

14   private entities known as the Omega Chemical Potentially Responsible Parties

15   Organized Group ("OPOG") that was formed several years ago to efficiently work

16   together and with government regulators to perform necessary response actions at the

17   Omega Chemical Superfund Site.

18       59.    Plaintiffs and other members of OPOG entered into a consent decree

19   memorializing a settlement between the United States, the California Department of

20   Toxic Substances Control, Plaintiffs, and others with respect to certain liability for the

21   OU-2 regional groundwater contamination ("the OU-2 Consent Decree").  Under the

22   OU-2 Consent Decree, "work parties," a group of settling PRPs that includes

23   Plaintiffs, will implement certain response actions at OU-2 which will address the

24   regional groundwater contamination.  None of the Defendants in this action are

25   signatories to the OU-2 Consent Decree, and those Defendants have not contributed

26   to the costs arising under the OU-2 Consent Decree.  On April 20, 2016, the United

27   States lodged the OU-2 Consent Decree, contemporaneously with the filing of the

28   typical companion complaint asserting claims under CERCLA Sections 106 and 107

- 14 -

against the signatories to the OU-2 Consent Decree, in the civil action titled *United States of America, et al. v. Abex Aerospace, et al.*, Case No. 2:16-CV-02696 ("*Abex*"). On March 31, 2017, the court presiding over the *Abex* action, the Hon. George H. Wu, entered an order approving the OU-2 Consent Decree.

60.    After approval of the OU-2 Consent Decree, certain members of OPOG, listed on Exhibit B hereto, agreed with Plaintiffs to withdraw from OPOG and further agreed that those former members would thereafter be recognized, or will be recognized, as "Settling Cash Defendants" under the OU-2 Consent Decree, as that term is defined under the consent decree.  Those former members of OPOG are hereafter referred to as the "Assignors."

61.    Upon their withdrawal from OPOG, the Assignors individually entered into express agreements with Plaintiffs to transfer and assign to Plaintiffs the rights, title, and interest, then held by the Assignors, in and to certain claims and causes of action arising under federal and state law and based upon the obligations that Assignors were required to perform under the OU-2 Consent Decree.  Those assigned claims include, but are not limited to, causes of action against Defendants for contribution under the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. § 9601 *et seq*. and declaratory relief under the Federal Declaratory Judgments Act, 28 U.S.C. § 2201, and CERCLA § 113(g)(2) (the "Assigned Claims").

62.    The Assignors were, at the time of the assignments described above, entitled to contribution from Defendants.  Assignors are companies and other entities that: (i) incurred significant costs to investigate the sources to, and the remediation of, OU-2 in a manner consistent with the NCP; (ii) have entered into the OU-2 Consent Decree and are subject to the work party obligations arising thereunder, including payment of past and future response costs to implement the work required under the OU-2 Consent Decree; and have paid more than their fair share of response costs arising under the OU-2 Consent Decree, all as alleged more fully under Paragraphs

- 15 -

4-6 and 58, 60, above, which are repeated and re-alleged as to Assignors as though fully set forth herein.  The Assignors are also entitled to recover against Defendants because releases of hazardous substances at Defendants' Source Properties are contributing and/or have contributed to the OU-2 contamination, but Defendants have not paid any response costs arising under the OU-2 CD.

63.    Accordingly, by this Action, Plaintiffs seek to recover against Defendants under the Assigned Claims in addition to the claims asserted herein on Plaintiffs' own behalf.

**C.    Defendants Have Contributed to the OU-2 Groundwater Contamination**

64.    Each of the Source Properties set forth below is located above or immediately adjacent to OU-2.  Upon information and belief, each is a source of the OU-2 groundwater contamination.  The approximate locations of the Source Properties are shown in the attached Exhibit C.

**1.    The Cal-Tron Source Property – 11919 Rivera Road**

65.    Upon information and belief, releases of hazardous substances have occurred from the property, and businesses operating thereon, located at and/or adjacent to 11919 Rivera Road, Santa Fe Springs, California and businesses operating thereon (the "Cal-Tron Source Property"), including releases of hazardous substances during the time that Cal-Tron conducted commercial or industrial operations at that property.

*a.    Source Property Ownership and Operation*

66.    Cal-Tron began operating at the Cal-Tron Source Property in 1976, providing metal plating and polishing services to businesses and private party accounts and continues to conduct these operations today.  Upon information and belief, Cal-Tron has performed both electroplating and electroless plating at the Cal-Tron Source Property.  Electroplating is the process by which a thin surface coating of one metal is applied to a part made of another metal by placing the part in a

- 16 -

bath of chemical plating solution and using an electric current to transfer metal ions. Electroless plating likewise deposits a thin metal coating on a part by immersing it in a chemical plating solution without the use of electric current.

67.     Hazardous substances, including chromium, PCE, TCE, and 1,1,1-TCA were stored, used, or were otherwise present at the Cal-Tron Source Property since at least 1976.  Cal-Tron used PCE, TCE, 1,1,1-TCA in connection with Cal-Tron's plating operations and used compounds containing hexavalent chromium to plate items with that metal.  In one year alone, Cal-Tron used over 2,800 pounds of PCE in its operations.

68.     Industrial activities at the Cal-Tron Source Property created significant quantities of hazardous waste, including wastes containing chromium, PCE, and 1,1,1-TCA.  Electroplating and electroless plating generate wastewater containing chromium and other metals as well as toxic organic chemicals.  Additionally, before a part can be plated, it is typically cleaned of foreign substances, such as oil and grease, using a vapor degreaser and a solvent.  A typical vapor degreaser boils a halogenated solvent (such as PCE, TCE, and 1,1,1-TCA) to create a hot vapor into which metal, glass, or plastic items are immersed to remove the grease, fats, oils, wax, or soil.

69.     There were at least two degreasers used at the Cal-Tron Source Property, one of which was known to utilize PCE and 1,1,1-TCA and was operated nearly around the clock.  In fact, during one period in the early 1990s, Cal-Tron operated the vapor degreaser for 16 hours a day, five days a week, 52 weeks of the year.

70.     Although vapor degreasers often reuse the vapor after it cools and condenses, the process generates hazardous waste in the form of residual liquid solvent and sludge that must either be disposed of or treated.  The storage and use of solvents in vapor degreasers has historically been associated with spills, leaks, and releases into the environment.

71.     Besides the degreasers, operations at the Cal-Tron Source Property have involved other equipment commonly associated with releases, and threatened

1   releases, of hazardous substances into the environment.  Clarifiers are one such

2   example.  There were also numerous underground storage tanks at the property.

3   Several of the tanks, which were in use as far back as the 1970s, were made of

4   concrete, an inherently porous material, and were used to treat rinse water from the

5   metal plating tanks.  These tanks held dozens to hundreds of gallons of rinse,

6   including rinse containing chrome.

7       72.    Wastewater discharges at the Cal-Tron Source Property may have been

8   as high as 28,000 gallons per day in the 1970s.

9                   *b.*    *Disposal and Releases of Hazardous Substances*

10      73.    Cal-Tron received numerous notices of violation and complaints for its

11  poor practices in the use, handling, storage, and disposal of hazardous substances, and

12  waste containing hazardous substances.  For example, Cal-Tron received a warning

13  notice from the Los Angeles County Sanitation District regarding a violation of

14  Federal EPA Pretreatment Standards relating to wastes generated at the property.  It

15  received multiple Notices of Violation for discharging to the sewer wastewater that

16  contained concentrations of chromium in excess of the allowable limit.  It received a

17  Notice of Violation and Order to Comply issued by the Santa Fe Springs Fire

18  Department after an inspection disclosed a tank without containment and PCE at the

19  property, and received a Notice of Significant Noncompliance for the period 2000 to

20  2003 relating to wastewater violations.

21      74.    In 2003, the Regional Water Quality Control Board – Los Angeles

22  ("Board") issued a Cleanup and Abatement Order to Cal-Tron.  The order was

23  prompted by the Board's conclusion that Cal-Tron had discharged pollutants into

24  Coyote Creek near the Cal-Tron Source Property and by Cal-Tron's failure to

25  implement measures to prevent such discharges.  Later that year, inspections by EPA

26  revealed the deplorable state of affairs at the property, describing it as "very messy."

27  EPA also noted that chemicals and rinse water were not properly managed but were

28  dripping on the floor and the pump designed to collect the spilled liquid and transport

it for treatment was inoperable.  The following year, EPA issued a warning letter to Cal-Tron concerning its waste handling practices, and in 2008, Cal-Tron entered into a consent order to resolve violations regarding the treatment and storage of hazardous wastes at the Cal-Tron Source Property.

75.     As a result of these poor practices, hazardous substances have leaked, spilled, were disposed of and/or were discharged to the ground at the Cal-Tron Source Property and have contaminated the surface and subsurface soils at that property.  At one point, an external generator at the property caught fire and unexpectedly released hazardous substances into the street that then migrated offsite.

76.     Upon information and belief, Cal-Tron's operations at the Cal-Tron Source Property have resulted in contamination of the surface and subsurface soils at the property.  Because hazardous substances were deposited, stored, disposed of, placed, or otherwise came to be located at the Cal-Tron Source Property, the Cal-Tron Source Property is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

77.     Upon information and belief, the hazardous substances present at the Cal-Tron Source Property, including in the soil, have migrated and continue to migrate downward into the saturated zone beneath the property and have come to be located in the groundwater, resulting in contamination of the groundwater in OU-2. Hydropunch samples collected at various locations on the Cal-Tron Source Property at depth have detected concentrations of PCE, TCE, and cis-1,2-DCE.  Further, PCE, TCE, and chromium, a significant constituent of wastewater discharged at the property, has been detected in wells located close to the Cal-Tron Source Property, and a subslab sample collected in 2016 had elevated detections of PCE, TCE, 1,1,1-TCA, acetone, and chloroform.

**2.      The Electronic Chrome Source Property – 9128 and 9132 Dice Road**

78.     Upon information and belief, releases of hazardous substances have occurred from the property, and businesses operating thereon, located at and/or adjacent to the former address 9128 and 9132 Dice Road, Santa Fe Springs, California (the "Electronic Chrome Source Property") including releases of hazardous substances during the time that Electronic Chrome conducted commercial or industrial operations at that property.

*a.      Source Property Ownership and Operation*

79.     Electronic Chrome began operating at the Electronic Chrome Source Property no later than 1969 and perhaps as early as 1966 and continues to conduct operations at that property today.  Operations there included hard chromium plating and grinding services on industrial rolls, hydraulic cylinders, and miscellaneous parts. Electronic Chrome's industrial activities also included receiving chromed metal parts from customers, stripping those parts, and re-chroming them.  Documents indicate that in the 1970s, Electronic Chrome conducted operations at the property for 16 to 24 hours each day.

80.     Hazardous substances, including chromium, TCE, and methyl ethyl ketone, were stored, used, or were otherwise present at the Electronic Chrome Source Property.  Hazardous materials were stored in various locations, including the shipping and receiving area, an exterior containment cell, an exterior equipment shed, the buffing area, the chrome shop, and the rectifier and grinding areas.  Chromium was stored at the exterior equipment shed and in the chrome shop.  Electronic Chrome operated between six and fourteen hexavalent chromium plating tanks throughout the years.  Use of such tanks dates as far back as the 1960s.

81.     Electronic Chrome's use of hazardous substances was significant. It used tens of thousands of pounds of chromic trioxide (hexavalent chromium) from

1   1990 to 2007 and hundreds of gallons of 1,1,1 TCA and methyl ethyl ketone in the

2   1990s.

3        82.    The industrial activities performed at the property created significant

4   quantities of hazardous waste, including hexavalent chromium waste.  In one year

5   alone, Electronic Chrome generated over 20,000 gallons of chromic

6   acid-contaminated water.  Most significantly, the electroplating operations generated

7   liquid waste from the electroplating tanks, chromium-contaminated rinse water,

8   waste chromic acid solution, chromium waste filter cake, and hazardous waste liquid

9   chromium.

10        83.    The plating process first involves grinding the part that is to be plated.

11   Ground material and water used in the grinding process generates a sludge that is

12   categorized as a hazardous waste given its chrome content.  The part is then placed in

13   a large tank of acid solution for further stripping, generating concentrated waste

14   containing hexavalent chromium from the acid strip tank.  The spent solution from the

15   tank is treated and processed, resulting in "filter cake," which is characterized as a

16   hazardous waste given its chrome content. The stripped part is submerged in a very

17   large chrome electro polishing tank, rinsed, and ground again for a smooth finish,

18   generating significant quantities of waste chromic solution and

19   chromium-contaminated sludge.

20                 *b.*    *Disposal and Releases of Hazardous Substances*

21        84.    Electronic Chrome has a long history of receiving notices of violation

22   from various governmental entities for its poor practices in the use, handling, storage,

23   and disposal of hazardous substances and waste containing hazardous substances.  It

24   has been noticed for illegally disposing of hazardous waste to the sewer line without a

25   permit.  It has been noticed for failing to maintain or repair equipment and allowing

26   leaks from that equipment to be discharged to ground.  It has been noticed for failing

27   to construct a secondary containment system to prevent rinse water containing

28   hazardous substances from escaping from a holding tank and being discharged to the

1    ground.  It has been noticed for storing hazardous waste onsite rather than timely

2    moving it offsite to an appropriate facility.  The Santa Fe Springs Fire Department

3    cited Electronic Chrome for disposing chrome-contaminated materials in the trash

4    rather than properly processing the waste.  The Los Angeles Department of Health &

5    Safety issued an Order to Comply, demanding that Electronic Chrome immediately

6    stop disposing of chrome waste directly to the bare ground.

7        85.    An inspection by the Los Angeles County Department of Public Works

8    found further problems.  Electronic Chrome had constructed a 1,000-gallon,

9    epoxy-coated, concrete sump, or "pit," in the floor beneath chromium tanks to capture

10   overflow.  Overflow waste in the pit was supposed to be pumped out and treated.

11   However, the Public Works inspector observed Electronic Chrome employees rinsing

12   chrome parts on top of the pit.  The inspector also observed that the rinse pit was filled

13   with a brownish liquid waste three inches deep.  The liquid waste appeared to be

14   chrome waste, and the walls of the pit appeared corroded.  Plaintiffs are informed and

15   believe that the chrome waste in the pit were the result of, among other things, spills

16   from and/or periodic overflows from the chromium tanks that Electronic Chrome

17   failed to anticipate or otherwise mitigate against.  Based upon this inspection,

18   Electronic Chrome was issued a Notice of Non-Compliance.

19       86.    Prior to 1976, Electronic Chrome was discharging process wastewater

20   containing hazardous wastes, including chromic acid, directly to the main sewer line.

21   In one day alone, Electronic Chrome discharged thousands of gallons of waste water

22   containing significant concentrations of chromium to the sewer.  And a 1986 sample

23   showed an extremely high level of hexavalent chromium in the soil in an alley at the

24   back of the property.

25       87.    Not surprisingly, given these poor practices, hazardous substances,

26   including chromium and hexavalent chromium, have been detected in soil samples

27   taken on the Electronic Chrome Source Property.  A soil sample from the back alley

28   of the property detected chromium in the soil, and a sample from a dike leading off

the property contained significant concentrations of chromium and hexavalent
chromium.  A 2016 investigation discovered hexavalent chromium in shallow soils,
with the highest concentrations near the plating tanks on the property, and various
sub-slab soil vapor detections near the areas where solvents were used.  Plaintiffs are
informed and believe that these detections resulted from releases to the soil,
throughout the years of operations, at the Electronic Chrome Source Property,
including but not limited to documented spills, overflows, chronic or sudden leaks,
and discharges.  Because hazardous substances were deposited, stored, disposed of,
placed, or otherwise came to be located at the Electronic Chrome Source Property, the
Electronic Chrome Source Property is a "facility" within the meaning of Section
101(9) of CERCLA, 42 U.S.C. § 9601(9).

88.     Upon information and belief, the hazardous substances present in the
soil at the Electronic Chrome Source Property have migrated and continue to migrate
downward into the saturated zone beneath the property and have come to be located in
the groundwater, resulting in contamination of the groundwater in OU-2.  EPA
concurs with this conclusion.  In 2010, EPA completed its Remedial Investigation /
Feasibility Study for OU-2 (the "OU-2 RI/FS").  The purpose of the OU-2 RI/FS was,
among other things, to collect data to determine the nature and extent of the OU-2
contamination.  In the OU-2 RI/FS, EPA designated the Electronic Chrome Source
Property as "Site G" and concludes that Site G is a potential contributor of hexavalent
chromium to the OU-2 groundwater.

### 3.     The Sunrise Source Property – 12353-12357 E. Whittier Blvd.

89.     Upon information and belief, releases of hazardous substances have
occurred from the property, and businesses operating thereon, located at and/or
adjacent to the former address 12353-12357 E. Whittier Boulevard, Whittier,
California (the "Sunrise Source Property").

90.     EPA has reached the same conclusion.  As more fully alleged below, in
its 2010 OU-2 RI/FS, EPA concluded, based upon the levels of TCE in the soil and

- 23 -

groundwater there, that releases at the Sunrise Source Property had contributed to the OU-2 contamination.  And in 2017, Sunrise received a General Notice Letter ("GNL") from EPA.  In that letter, EPA identifies Sunrise as potentially liable under CERCLA Section 107 for the OU-2 groundwater contamination and for past and future costs to clean up that contamination.

91.     Upon information and belief, the Sunrise Source Property includes the real property located at the address formerly identified as 801 W. Whittier Blvd. in Whittier, California.

a.     *Source Property Ownership and Operation*

92.     Defendant Sunrise is the current owner of the Sunrise Source Property and has owned it since at least 1989.  The property is contaminated with numerous hazardous substances that were used there by companies that currently occupy or formerly occupied the site and either neglected or refused to properly handle and dispose of those substances.

93.     Since no later than the 1960s, and likely as early as 1955, numerous entities have conducted commercial and industrial operations at the Sunrise Source Property.  Upon information and belief, those entities included, but are not limited to, American Cushion Co., Tropical Sun Outdoor Co., Regal Fireplace Equipment, L&N Body Repair, Tony's Upholstery, Whittier Auto Electric, Eclipse Engineering, Ricks Auto Electric, Anthony's Muffler Shop, Anthony's Muffler Brakes & More, Atlas Transmission Shop, and Bills Auto Care, Crazy Joe's Auto Care, Amer Automobile Center, and Top Bear Auto Center.  As these names suggest, operations at the Sunrise Source Property consisted mostly of automobile repair and maintenance and furniture manufacturing.

94.     These operations involved the use of various hazardous substances, including TCE.  The automobile repair and maintenance shops used solvents to clean parts and generated substantial amounts of solvent waste.  The furniture manufacturers similarly used solvents in their manufacturing processes to clean metal

1   parts in the production of outdoor furniture.  Although documents suggest that

2   workers cleaned and degreased metal parts manually, vapor degreasers were also used

3   at the property.  The solvents used in these processes included toluene and 1,1,1 TCA,

4   but waste manifests and soil data from 1995 indicate that TCE was used in the vapor

5   degreasers or elsewhere on the property.  Permitting documents suggest that chromic

6   acid was also used at the Sunrise Source Property.

7        95.    Upon information and belief, the furniture manufacturers utilized a

8   subsurface clarifier to treat wastewater generated during the manufacturing processes

9   at the Sunrise Source Property.  This clarifier would prove problematic from an

10   environmental perspective given that clarifiers are prone to leakage, especially if

11   constructed out of permeable materials such as concrete.

12              *b.*    *Disposal and Releases of Hazardous Substances*

13        96.    The practices for handling, storing, and disposing of hazardous

14   substances that were employed by the companies doing business at the Sunrise

15   Source Property were far from perfect.  Upon information and belief, both the

16   furniture manufacturers and the automobile repair and maintenance shops received

17   numerous notices of violation for failing to properly handle, store, and dispose of

18   hazardous substances and waste containing hazardous substances.  For example,

19   Tropical Sun was issued an Order to Comply arising from poor maintenance of the

20   paint spray booth onsite, improper use of solvents for degreasing, and the deteriorated

21   condition of flooring in the manufacturing areas.  Top Bear was issued a Notice of

22   Violation for failing to properly maintain a hot wash tank for transmission of waste.

23   Whittier Auto Electric was noticed in connection with its hazardous waste handling

24   practices.  Defendant Sunrise has also received notices of violation, as, for example,

25   when it was ordered to dispose of abandoned hazardous waste, including solvent

26   waste, stored at the Sunrise Source Property.  Upon information and belief, such

27   waste included TCE-contaminated waste.

28

97.     Inspections discovered other poor maintenance practices.  Significant amounts of sludge were observed in tanks used at the property, as well as on the subfloor beneath those tanks.  A vapor degreaser used at the site for decades to clean metal parts with solvent vapors was observed to be in very poor condition.  The furniture manufacturing plant had fallen into such disrepair that ceiling tiles were falling down and there were large holes in the floor.  Tests conducted on the clarifier that was used by the automobile repair and maintenance shops indicated a multitude of chemicals of concern, including solvents.  Upon information and belief, those solvents included TCE.

98.     These poor practices resulted in hazardous substances and waste being spilled, leaked, discharged, and disposed of at the Sunrise Source Property.  TCE has been detected in the soil at the Sunrise Source Property at the former location of the clarifier.  However, concentration levels of TCE detected at the property suggest that the clarifier was not the only source of TCE releases to the environment; additional sources are strongly suspected.  There is extensive evidence of TCE soil contamination in the area around the dip tank/degreaser and the paint spray booth at the furniture plant.

99.     Testing done in the mid-1990s indicated high concentrations of TCE found in the soil that increased with depth.  Such a pattern is indicative of releases that occurred in the past and that have been migrating through the soil column over the decades.  Chromium has also been detected in a boring sample.  Because hazardous substances were deposited, stored, disposed of, placed, or otherwise came to be located at the Sunrise Source Property, the Sunrise Source Property is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

100.    The hazardous substances discharged to the surface and subsurface soils at the Sunrise Source Property have migrated downward into the OU-2 groundwater and have commingled with contaminants from other sources.  Investigations have revealed a TCE groundwater plume with the highest concentrations of TCE detected

1   in the area surrounding the dip tank/degreaser, paint spray booth, and in the

2   downgradient direction for approximately 1,000 feet before beginning to taper off.

3       101.   Contamination at the Sunrise Property has not been remediated and

4   continues to present a risk to the environment.  As recently as 2014, Defendant

5   Sunrise entered into a Voluntary Cleanup Agreement with the California Department

6   of Toxic Substances Control ("DTSC").  Under that agreement, DTSC will provide

7   oversight of the investigation and possible remediation of releases and threatened

8   releases of hazardous substances, including TCE and PCE, at the Sunrise Source

9   Property.

10      102.   EPA has similarly concluded that the Sunrise Source Property remains a

11  problem that must be addressed.  In its 2010 OU-2 RI/FS, EPA identified a TCE

12  source area at Whittier Blvd., referred to in the RI/FS as the "TCE Source Area," that

13  is located in the general vicinity of the Sunrise Source Property.  The TCE Source

14  Area was included in the OU-2 RI/FS as a potential source of the OU-2 groundwater

15  contamination because TCE has been detected in soil samples ranging from 9 µg/kg

16  to 170 µg/kg, and TCE has been detected in higher concentrations in groundwater

17  downgradient of the TCE Source Area than upgradient, with maximum

18  concentrations being 2,700 µg/L.

19          **4.    The Mid-West Source Property – 8623 Dice Road**

20      103.   Upon information and belief, releases of hazardous substances have

21  occurred from the property located at and/or adjacent to 8623 Dice Road, Santa Fe

22  Springs, California and businesses operating thereon (the "Mid-West Source

23  Property") including releases of hazardous substances during the time that Mid-West

24  conducted operations at that property.

25          a.    *Source Property Ownership and Operation*

26      104.   In or around 1961, Mid-West began operating a manufacturing facility

27  for bolts and wire fasteners at the Mid-West Source Property and continues to operate

28  at that property today.  The bolts and fasteners are produced by forming steel wire,

1    and the manufacturing operations or processes include forming, threading, parts

2    washing, plating, including zinc plating, and other metal working operations.  In or

3    around 1964, Mid-West acquired title to the Mid-West Source Property.  It remains

4    the owner today.

5        105.   Over the years, operations at the Mid-West Source Property involved

6    the use of various hazardous substances, including chromic acid and chromate

7    solution, both of which contain hexavalent chromium.  These operations generated a

8    significant amount of waste.  For example, in the mid-1980s, Mid-West was

9    generating 10,000 gallons per day of wastewater.  The rate of discharge during the

10   1970s was substantially similar, topping 8,000 gallons per day. Upon information and

11   belief, prior to 1972, all wastes generated at the Mid-West Source Property were

12   discharged to the sewer rather than transported offsite for proper disposal.

13       106.   Wastewater and washdown from the plating area was processed onsite in

14   subsurface, concrete clarifiers ranging in size from 675 to 1,200-gallons.  Concrete,

15   underground, clarifiers, like those used at the Mid-West Source Property, have long

16   been considered sources of environmental contamination given the porous nature of

17   concrete.  Moreover, some of the piping leading to and from the clarifiers at the

18   property were made of permeable materials, significantly increasing the likelihood

19   that hazardous waste passing through the piping system and the clarifiers would leak

20   into the surrounding soils.

21       107.   Ultimately, the wastewater, including wastewater containing chromic

22   acid, was processed and discharged into the sewer.  This practice presented yet

23   another opportunity for hazardous waste, including chromium, to be released into the

24   environment.  Sewer lines of the vintage that were, and may still be, present at the

25   Mid-West Source Property were frequently constructed from permeable materials,

26   including vitrified clay and concrete.  Such sewers are invariably subject to leakage

27   and releases of their hazardous contents to the surrounding soils.

28

b.     _Disposal and Releases of Hazardous Substances_

108.   Like other Defendants in this matter, Mid-West's practices in handling hazardous substances and waste at the Mid-West Source Property have attracted the attention of various governmental agencies.  It received a Notice of Violation and Order to Comply relating to its waste disposal practices, and these practices have resulted in hazardous substances and hazardous waste being spilled, leaked, discharged, and disposed of at the Mid-West Source Property.

109.   Upon information and belief, in the early 1980s, employees of Mid-West dumped hazardous waste onto the bare ground along railroad tracks and a right-of-way on or near the Mid-West Source Property.  The waste migrated offsite to a culvert, underneath the railroad tracks, and into a pond.  A black substance was later observed in the culvert, and the soil along the railroad tracks was discolored.

110.   Inspections in the early 1980s noted evidence of dumping of hazardous substances onto the ground.  A ditch along the western side of the property was filled with oily liquids and sludge; vegetation running alongside or near the ditch was discolored with a whitish-gray powder.  Solid waste debris drainage discharged into a receiving pond at the property, and soil near the parking area at the property was discolored with a dark, oily substance.  Inspectors also observed an area of liquid pooling beyond the railroad tracks.

111.   Mid-West was found to be discharging water from a rolling machine that contained oil.  The culvert was covered with concrete for approximately 25 yards and contained up to one-half inch of oily sludge.  Mid-West was informed that the discharge was prohibited and that the rolling machine had to be moved or modified to discharge into the existing interceptor, and the oil in the culvert was to be removed.  The oil and deposits were located on the western border of the site along the railroad spur along the property.

112.   There was also a cyanide spill due to the fire tube in the cyanide tank springing a leak.  Approximately 30-40 gallons of cyanide spilled into the bermed area.

113.   Upon information and belief, the hazardous substances and waste spilled, leaked, discharged, and disposed of at the Mid-West Source Property included PCE, carbon tetrachloride, 1,4-dioxane, and aluminum.  Because hazardous substances were deposited, stored, disposed of, placed, or otherwise came to be located at the Mid-West Source Property, the Mid-West Source Property is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

114.   Upon information and belief, the hazardous substances present in the surface and subsurface soils at the Mid-West Source Property have migrated, and continue to migrate, downward into the saturated zone beneath the property and have come to be located in the OU-2 groundwater.

115.   EPA reached this same conclusion.  In the 2010 OU-2 RI/FS, EPA designated the Mid-West Source Property as "Site F" and concluded that Site F is a potential contributor of PCE, carbon tetrachloride, and 1,4-dioxane to the OU-2 groundwater.  Groundwater samples taken from wells located downgradient of the Mid-West Source Property contain higher concentrations of PCE, carbon tetrachloride, and 1,4-dioxane than were detected in wells located upgradient of the property.  The same holds true for downgradient versus upgradient concentrations of certain heavy metals in the groundwater.  Based on this information, EPA considers Site F to be a possible contributor of the heavy metals aluminum, manganese, arsenic, and vanadium to OU-2 groundwater.

**5.   The Santa Fe Rubber Source Property – 12306 E. Washington Blvd.**

116.   Upon information and belief, releases of hazardous substances have occurred from the property located at and/or adjacent to 12306 E. Washington Boulevard, Whittier, California and businesses operating thereon (the "Santa Fe

1    Rubber Source Property") including releases of hazardous substances during the time
2    that Santa Fe Rubber conducted operations at that property.

3                    *a.*        *Source Property Ownership and Operation*

4        117.   Since 1970, Santa Fe Rubber has operated as a custom molder of rubber
5    parts at the Santa Fe Rubber Source Property.

6        118.   Upon information and belief, hazardous substances were disposed of at
7    the Santa Fe Rubber Source Property and released into the environment since at least
8    1970.

9        119.   The use of solvents, such as TCE, in the rubber industry is well
10   documented, and Santa Fe Rubber has stored and used significant quantities of
11   chlorinated solvents in its manufacturing process at the Santa Fe Rubber Source
12   Property. Upon information and belief, such use began in the 1970s and continued
13   until at least 2004.

14                   *b.*        *Disposal and Releases of Hazardous Substances*

15       120.   Santa Fe Rubber's manufacture of rubber parts created significant
16   quantities of waste, including waste containing solvents such as TCE and
17   1,1,1,-trichloroethane.  Upon information and belief, Santa Fe Rubber has stored its
18   waste, including waste TCE and waste containing TCE and 1,1,1,-trichloroethane,
19   outdoors, on the ground, in one or more containers at the rear of the Santa Fe Rubber
20   Source Property where it was exposed to the weather, moisture, direct sunlight, and
21   other conditions that could cause, and accelerate, the deterioration of those containers
22   and release the waste to the ground.  Santa Fe Rubber has reported that, between 1970
23   and 2010, the Santa Fe Rubber Source Property did not have a stormwater drainage
24   system that might prevent hazardous substances and hazardous waste which had
25   spilled, leaked, or escaped from tanks or containers from being carried with the storm
26   water to unpaved, or poorly paved, areas at or near the property and onto the soil.

27       121.   Upon information and belief, Santa Fe Rubber has not taken appropriate
28   measures at the Santa Fe Rubber Source Property to ensure the safe use, handling, and

1   storage of hazardous substances and waste containing hazardous substances such as

2   TCE and 1,1,1,-trichloroethane. As a result of these poor practices throughout the

3   years of Santa Fe Rubber's operations, hazardous substances have leaked, spilled,

4   were disposed of and/or were discharged to the ground at the Santa Fe Rubber Source

5   Property and contaminated the surface and subsurface soils at that property.  Because

6   hazardous substances and waste containing hazardous substances were deposited,

7   stored, disposed of, placed, or otherwise came to be located at the Santa Fe Rubber

8   Source Property, the Santa Fe Rubber Source Property is a "facility" within the

9   meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

10      122.   Upon information and belief, the releases and disposals of hazardous

11   substances at the Santa Fe Rubber Source Property as a result of Santa Fe Rubber's

12   operations have migrated downward, through the soils and into OU-2 and away from

13   the Santa Fe Rubber Source Property.  Groundwater monitoring data collected by

14   EPA from wells situated upgradient and downgradient of the Santa Fe Rubber Source

15   Property supports this conclusion.  Concentrations of hazardous substances, such as

16   TCE, detected in wells situated upgradient of the property are lower than

17   concentrations of hazardous substances, including TCE, detected in wells situated

18   downgradient of the property, a telltale sign that the Santa Fe Rubber Source Property

19   is contributing source of chlorinated solvents contamination in OU-2.

20          **6.      The Halliburton Source Property – 12310, 12314, and 12320**

21                   **South Bloomfield Avenue**

22      123.   Upon information and belief, releases of hazardous substances have

23   occurred from the property located at and/or adjacent to 12310, 12314, and 12320

24   South Bloomfield Ave, Santa Fe Springs, California and businesses operating thereon

25   (the "Halliburton Source Property").

26              *a.      Source Property Ownership and Operation*

27      124.   Halliburton, Otis Engineering Corp., and Welex, all subsidiaries of

28   Halliburton have operated at the Halliburton Source Property. Those entities engaged

1   in various industrial activities at the Halliburton Source Property, including, but not
2   limited to, the manufacture and maintenance of oil rigging and oil pumping and
3   recovery systems.  Halliburton began conducting industrial operations at the
4   Halliburton Source Property in the 1940s, when the property operated as an oil field
5   services facility.  By the 1950s, operations included pipe fabrication and welding and
6   bending of steel pipe.

7       125.   Upon information and belief industrial operations conducted by
8   Halliburton involved the use, handling, storage, and disposal of hazardous substances,
9   including PCE and/or TCE and other solvents, and the handling, storage, and disposal
10  of waste containing hazardous substances.  Solvents were used to clean parts and
11  equipment, and other hazardous substances, including 1,1,1-TCA, 1,4-dioxane, zinc
12  chromate, and chlorinated solvents, were used and stored at the Halliburton Source
13  Property.

14      126.   Industrial activities at the Halliburton Source Property created
15  significant quantities of waste, including thousands of gallons of waste each month
16  which contained carbon, oil, and non-combustible solvents.  These wastes were
17  generated from various activities, including parts and tool washing as well as
18  wastewater from a truck wash area.  One report from the 1970s indicated that
19  Halliburton was generating 16,000 gallons of liquid waste every month.

20      127.   Operations at the Halliburton Source Property throughout the years has
21  involved various equipment and activities commonly associated with releases, and
22  threatened releases, of hazardous substances into the environment.  Halliburton made
23  use of a concrete clarifier at the Halliburton Source Property to process waste material
24  and waste water generated from cleaning service equipment.  Given that concrete is
25  inherently porous, concrete clarifiers are well-known sources of releases of their
26  hazardous contents into the ground.

27      128.   Floor canals and concrete holding pits were utilized to capture excess
28  chemicals and discharges of chemicals and hazardous substances at the transportation

docks where such substances were loaded and unloaded.  Sumps, another well-known

source of environmental contamination, were also used at the property.

b.     *Disposal and Releases of Hazardous Substances*

129.   From the 1970s to the 1990s, Halliburton received numerous notices of

violation and complaints for its poor practices in the use, handling, storage, and

disposal of hazardous substances, and waste containing hazardous substances.  In

1971, for example, the Los Angeles Department of County Engineers issued a Notice

of Violation and Order to Comply because oil and solvent had been discharged to the

ground at the property, or on a neighboring property, from the parts washing area.

The Los Angeles County Sanitation District also issued a Notice of Violation to

Halliburton, noting that the onsite industrial wastewater pretreatment system and

devices were not in good working order.  Halliburton also received an Order to

Comply to discontinue certain of its disposal and storage practices involving solvents.

130.   As a result of these poor practices, hazardous substances have leaked,

spilled, were disposed of and/or were discharged to the ground at the Halliburton

Source Property and contaminated the surface and subsurface soils at that property.

In the 1980s, for example, a solvent holding tank overflowed and released solvent

onto uncovered soil on the property.  Pipe fabrication, welding, and bending

operations involved the use of a sump to process cooling water which was then

supposed to be pumped into a tank for repurposing; Halliburton, however, simply

released the excess cooling water onto the ground.  Waste water from the parts

washing area was discharged to the ground and washed out and drained to the street.

131.   Los Angeles County inspectors found several areas where oily waste

material had been spilled on the property and had migrated offsite and where oily

solvent material had been spilled directly onto the ground.  Other inspections revealed

200 55-gallon drums of oil, solvents, and other wastes stored onsite, but dozens of

these drums, containing xylene, diesel fuel, oils, solvents, and glycol esters, were in

such poor condition that they were literally falling apart.  Numerous other containers

containing hazardous substances, including solvents, were found to be in deteriorated condition, and a compressor pump was leaking fuel onto the ground.  During an inspection in 1998, inspectors observed workers removing contaminated soil at the Halliburton Source Property from tank locations and a sewer drain pipe.  In fact, the contamination at the Halliburton Source Property is so extensive, that in 1999, approximately 7,000 tons of non-hazardous, contaminated soil and 224 tons of hazardous waste soils were excavated from the Halliburton Source Property.

132.   Hazardous substances, including TCE, PCE, cis-1,2-DCE and toluene have been detected in soil samples taken on the Halliburton Source Property. Because hazardous substances were deposited, stored, disposed of, placed, or otherwise came to be located at the Halliburton Source Property, the Halliburton Source Property is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

133.   Upon information and belief, the hazardous substances present in the soil at the Halliburton Source Property have migrated and continue to migrate downward into the saturated zone beneath the property and have come to be located in the groundwater, resulting in contamination of the groundwater in OU-2. Hydropunch samples from borings at the property have detected various concentrations of hazardous substances, including TCE, 1,2-DCA, cis-1,2-DCE, benzene, and toluene.  The Regional Water Quality Control Board – Los Angeles has determined that the former chemical use and/or disposal activities at the Halliburton Source Property has impacted groundwater underneath the property.

### 7.      The Duncan Source Property – 12110 Clark Street

134.   Upon information and belief, releases of hazardous substances have occurred from the property located at and/or adjacent to 12110 Clark Street, Santa Fe Springs, California and businesses operating thereon (the "Duncan Source Property") including releases of hazardous substances during the time that Duncan conducted operations at that property.

*a.* *Source Property Ownership and Operation*

135.   Since 1993, Duncan has operated a machine shop for precision metal parts at the Duncan Source Property.  Upon information and belief, operations at Duncan involved metal cutting, milling, drilling, grinding, and metal parts washing. Machine shops, like Duncan, are well understood as risks to the environment absent strict compliance with appropriate practices for the handling of hazardous substances involved in the manufacturing process.

136.   Significant quantities of hazardous substances, including PCE, were stored, used, or were otherwise present at the Duncan Source Property.  Upon information and belief, industrial activities at the Duncan Source Property created significant quantities of waste, including PCE waste and waste containing PCE.

137.   Operations at the Duncan Source Property involved various equipment and activities commonly associated with releases, and threatened releases, of hazardous substances into the environment.  For example, at least one chlorinated solvent vapor degreaser has been used at the Duncan Source Property.  Vapor degreasers can release solvents to the environment in several ways and have a documented track record of causing groundwater contamination.

*b.* *Disposal and Releases of Hazardous Substances*

138.   Duncan has been cited for its poor practices in the use, handling, storage, and disposal of hazardous substances, and waste containing hazardous substances.  In May 2000, for example, the Santa Fe Springs Fire Department issued a notice of violation to Duncan in connection with its hazardous substances and waste practices. Duncan was required to implement measures to ensure proper storage of waste, prevent leaks from waste storage containers, and provide containment for hazardous substances maintained in an outside storage area.

139.   Upon information and belief, hazardous substances have leaked, spilled, were disposed of and/or were discharged to the ground at the Duncan Source Property as a result of Duncan's poor waste handling practices and those hazardous substances

1   have contaminated the surface and subsurface soils at that property.  Because

2   hazardous substances were deposited, stored, disposed of, placed, or otherwise came

3   to be located at the Duncan Source Property, the Duncan Source Property is a

4   "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

5       140.   Upon information and belief, the releases and disposals of hazardous

6   substances at the Duncan Source Property, as a result of Duncan's operations, have

7   migrated downward, through the soils and into OU-2 and away from the Duncan

8   Source Property.  Groundwater monitoring data collected by other entities in the

9   vicinity of the Duncan Source Property suggest that the property is a source of PCE

10  contamination in the OU-2 groundwater.

11          **8.       The Omega Chemical Source Property – 12504 and 12512**

12                   **Whittier Boulevard**

13      141.   Releases of hazardous substances have occurred from the Omega

14  Chemical property, located at 12504 and 12512 Whittier Boulevard, Whittier,

15  California (the "Omega Chemical Source Property") including releases of hazardous

16  substances during the time that Dennis O'Meara and Omega Chemical conducted

17  operations there.

18              *a.     Source Property Operation and Ownership*

19      142.   From 1974 to 1995, Omega Chemical conducted chemical treatment

20  operations on the property, including the storage, consolidation, and treatment of

21  commercial and industrial wastes, primarily solvent and refrigerant waste. Described

22  by EPA as a refrigerant and solvent recycling and treatment facility, chemicals were

23  sent to Omega Chemical for proper processing.  Drums and bulk loads of waste

24  solvents, including but not limited to PCE and TCE, and other chemicals from various

25  industrial activities were treated, stored, disposed of, and/or processed at the Omega

26  Chemical Source Property.

27      143.   Defendant Dennis O'Meara, the president, chief executive officer of

28  Omega Chemical, holds himself out as an expert with years of experience in the

handling and manufacture of hazardous substances and the processing of industrial waste, describing himself as having developed, built, and marketed an electronic grade line of chemicals and solvents to the electronics industries and an "innovator of recycling special chemical industrial waste back to the original material specifications."

144.   As president, chief executive officer, and the person responsible for the day-to-day management of, and decision-making concerning, the handling, storage, processing, and disposal of hazardous substances and waste by Omega Chemical, Dennis O'Meara had the authority to control, and exercised actual control over, all aspects of the industrial operations of Omega Chemical, including the processing of hazardous substances and the disposal of those substances and waste at the property.

145.   During the time that Omega Chemical operated at the Omega Chemical Source Property, Dennis O'Meara had personal knowledge of the manner in which the chemicals sent to Omega Chemical were handled, processed, stored, and/or disposed of, and the types and volumes of the chemicals sent to the property.  Once delivered to the property, those chemicals were wholly within the control and possession of Dennis O'Meara, as he maintained the exclusive authority to decide, and did decide, how those chemicals were handled, processed, stored, and/or disposed of and whether those chemicals would remain on the property at all.

146.   Upon information and belief, Omega Chemical employees were not permitted to modify, or deviate from, the established practices, protocols, and operational procedures for the handling, storage, processing and/or disposal of hazardous substances and waste without Dennis O'Meara's knowledge and consent. Plaintiffs are informed and believe that Dennis O'Meara directly supervised many of the chemical-processing, storage and disposal operations performed by Omega Chemical employees and may have even actively participated in some of them. Plaintiffs are further informed and believe that Dennis O'Meara, at all times relevant herein, had personal knowledge of the maintenance, repair, and replacement histories

1  of the equipment, machinery, and infrastructure involved in the processing of

2  chemicals by Omega Chemical, and that the maintenance, repair, and replacement of

3  that equipment, machinery, and infrastructure occurred only with the knowledge,

4  consent, and at the direction of, Dennis O'Meara.

5      147.   Upon information and belief, Dennis O'Meara observed spills, leaks,

6  and/or discharges of chemicals to the ground at the property, and/or received reports

7  from Omega Chemical employees concerning such spills, leaks, and/or discharges,

8  but he did not take, nor direct Omega Chemical employees to take, sufficient steps to

9  prevent, mitigate, and/or remediate the contamination.  Plaintiffs are informed and

10  believe that Dennis O'Meara was aware of numerous drums of unprocessed

11  hazardous waste present at the property and drums in various stages of deterioration,

12  many of which were corroded and leaking substances that were migrating to other

13  portions of the Omega Source Property, but he did not take, nor direct Omega

14  Chemical employees to take, sufficient steps to prevent, mitigate, and/or remediate

15  the contamination.

16     148.   Dennis O'Meara was also well aware of the investigations and

17  inspections conducted by various governmental entities at the Omega Chemical

18  Source Property.  He was also aware of the violations of safety practices observed by

19  those governmental entities and the measures those entities ordered Omega Chemical

20  to take to ensure the safe handling, storage, processing, and disposal of hazardous

21  substances and waste by Omega Chemical.

22     149.   Dennis O'Meara knew, or should have known, that the sloppy, careless,

23  neglectful, and recklessly indifferent manner in which Omega Chemical employees

24  handled, stored, processed, and/or disposed of hazardous substances and waste at the

25  Omega Chemical Source Property could, and in fact did, result in the release of

26  hazardous substances into the soil and groundwater at that property. Despite this,

27  Dennis O'Meara failed to take adequate steps over the years to prevent or otherwise

28  mitigate those releases of hazardous substances into the environment.

150.   In 1987, Omega Chemical purchased the Omega Chemical Source Property.  Defendant Vanowen Holdings LLC purchased the Omega Chemical Source Property in 2003 and remains the owner today.

b.   *Disposal and Releases of Hazardous Substances*

151.   Significant quantities of hazardous substances were stored or were otherwise present in hazardous waste and hazardous substances sent to the Omega Chemical Property for processing.  According to EPA, there have been numerous instances of releases of hazardous substances, including PCE and TCE at the Omega Chemical Source Property.  Between 1984 and 1988, Omega Chemical received numerous Notices of Violation from the Los Angeles County Department of Health Services, but to no avail.  Several years later, assessments conducted by EPA at the Omega Chemical Source Property revealed numerous drums of unprocessed hazardous waste present at the property and drums in various stages of deterioration, many of which were corroded and leaking substances that were migrating to other portions of the Omega Source Property.

152.   These spills and leaks of various chemicals, as well as other releases of hazardous substances, at the Omega Chemical Source Property have resulted in soil and groundwater contaminated with chlorinated and non-chlorinated solvents, including PCE and TCE.  Because hazardous substances were deposited, stored, disposed of, placed, or otherwise came to be located at the Omega Chemical Source Property, the Omega Chemical Source Property is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

153.   Contaminants from the Omega Chemical Property are reported to have migrated offsite in the same general direction as the groundwater flow.  EPA has concluded that VOCs, such as PCE and TCE, are in soil and groundwater at the Omega Chemical Property and have also migrated into OU-2 and away from the Omega Chemical Property and have commingled with contaminants resulting from releases of hazardous substances at other source areas, including but not limited to

1    Defendants' Source Properties.

2        154.   Remedial efforts are ongoing to address the contamination in the soils,

3    subsurface soils, and groundwater at and underneath the Omega Chemical Source

4    Property.  Omega Chemical and Dennis O'Meara have not paid or contributed to any

5    costs to remediate or address the contamination in OU-2.

6                            **FIRST CLAIM FOR RELIEF**

7                          **Contribution Under CERCLA**

8                            **Against All Defendants**

9        155.   Plaintiffs incorporate and re-allege Paragraphs 1 through 155 above, as

10   though fully set forth herein.

11       156.   Each Defendant is a "person" within the meaning of Section 101(21) of

12   CERCLA, 42 U.S.C. § 9601(21).

13       157.   Upon information and belief, each Defendant is a covered person within

14   the meaning of one or more of Section 107(a)(1), (2), (3), or (4), 42 U.S.C.

15   § 9607(a)(1)-(4).

16       158.   Upon information and belief, each Defendant Source Property is a

17   "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

18   Further, each Source Property is part of a larger CERCLA "facility," the groundwater

19   contamination in OU-2 as defined under the OU-2 Consent Decree, in that releases of

20   hazardous substances from each such Source Property has commingled with

21   chemicals released at other locations.

22       159.   Upon information and belief, releases and/or threatened releases of

23   hazardous substances into the environment have occurred, and in many cases are still

24   occurring, at each Source Property within the meaning of Section 101(22) of

25   CERCLA, 42 U.S.C. § 9602(22).

26       160.   Plaintiffs have entered into the OU-2 Consent Decree with the United

27   States and the California Department of Toxic Substances Control memorializing a

28

1  settlement under which Plaintiffs have resolved certain of their liability for the OU-2

2  groundwater contamination.

3      161.   The OU-2 Consent Decree was lodged by the United States in *Abex*, and

4  on March 31, 2017, the court presiding over the *Abex* action, the Hon. George H. Wu,

5  entered an order approving the OU-2 Consent Decree.

6      162.   The costs for which Plaintiffs are liable under the OU-2 Consent Decree

7  constitute necessary costs of response incurred in a manner consistent with the NCP

8  under 42 U.S.C. § 9607(a)(4)(B) to remediate hazardous substances.  These costs,

9  which include but are not limited to millions of dollars that Plaintiffs have already

10 expended to address the contamination contributed to OU-2 by Defendants, represent

11 more than Plaintiffs' allocable share of costs related to their releases or disposal of

12 hazardous substances into OU-2.

13     163.   Plaintiffs are entitled to contribution from all Defendants under Section

14 113(f) of CERCLA, 42 U.S.C. §§ 9613(f), for those Defendants' respective equitable

15 shares of all costs and damages incurred by Plaintiffs that exceed Plaintiffs' equitable

16 share of the costs for which Plaintiffs are liable under the OU-2 Consent Decree.

17     164.   Notice of this action is being provided to the Administrator of the

18 Environmental Protection Agency and the United States Attorney General, pursuant

19 to 42 U.S.C. § 9613(l).

20                    **SECOND CLAIM FOR RELIEF**

21     **Declaratory Judgment Under Federal Law – Against All Defendants**

22     165.   Plaintiffs incorporate and re-allege Paragraphs 1 through 165 above, as

23 though fully set forth herein.

24     166.   An actual and substantial controversy has arisen between Plaintiffs and

25 Defendants regarding their respective rights and obligations for the response costs

26 that have been incurred and the response costs that will be incurred to respond to the

27 releases of contaminants from the Source Property facilities.

28     167.   Pursuant to the Federal Declaratory Judgments Act, 28 U.S.C. § 2201,

1  and CERCLA § 113(g)(2), Plaintiffs are entitled to a declaratory judgment holding

2  Defendants liable under Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), for

3  contribution for those Defendants' respective equitable shares of all costs and

4  damages incurred by Plaintiffs.

5  **PRAYER FOR RELIEF**

6  WHEREFORE, Plaintiffs demand judgment in its favor and against

7  Defendants, to the extent authorized by law, as follows:

8  (1)  ON THE FIRST CLAIM FOR RELIEF, for contribution for all costs and

9  damages incurred by Plaintiffs, including pre-judgment interest thereon as allowed by

10  law, that exceed Plaintiffs' equitable share of the costs for which Plaintiffs are liable

11  under the OU-2 Consent Decree;

12  (2)  ON THE SECOND CLAIM FOR RELIEF, for a judicial declaration that

13  Defendants are liable for their respective equitable shares of all costs and damages

14  incurred by Plaintiffs, including pre-judgment interest thereon as allowed by law, that

15  exceed Plaintiffs' equitable share of the costs for which Plaintiffs are liable under the

16  OU-2 Consent Decree;

17  (3)  AS TO ALL CLAIMS FOR RELIEF, for all costs, fees, and expenses

18  incurred in this action, to the extent provided for by law;

19  (4)  AS TO ALL CLAIMS FOR RELIEF, for such other and further relief as

20  the Court may deem just and proper.

21

22  DATED: March 18, 2020                    LATHROP GPM LLP

23

24                                                          By:  /s/ Nancy Sher Cohen

25                                                          Attorneys for Plaintiffs

26

27

28