# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6456-GW(Ex) | Date | January 15, 2019 |
|---|---|---|---|
| Title | *Arconic, Inc., et al. v. APC Investment Co., et al.* | | |

Present: The Honorable    GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:              Attorneys Present for Defendants:

None Present                              None Present

**PROCEEDINGS:**     **IN CHAMBERS - RULING ON MOTION FOR SUMMARY JUDGMENT RE: STATUTE OF LIMITATIONS [740]**

Attached hereto is the ruling on Defendants' pending Motion for Summary Judgment based upon the Statute of Limitations as to the First and Third Causes of Action in the Fifth Amended Complaint.  The Court sets a status/scheduling conference for January 28, 2019 at 8:30 a.m.  The parties are to file a Joint status report by noon on January 24.

_____      :  _____

Initials of Preparer    JG

***Arconic, Inc., et al. v. APC Inv. Co.***, Case No. CV-14-6456-GW
Ruling[1] on Motion for Summary Judgment Re: Statute of Limitations

# I. Background

## A. Factual Background

In the operative pleading, Plaintiffs[2] assert claims against various Defendants,[3] arising under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 *et seq.* *See* Fifth Amended Complaint ("5AC") ¶ 2, Docket No. 526.

The 5AC alleges[4] the following: This action is one of several arising from environmental

---

[1] At the outset, the Court notes that this ruling is substantially similar in part and substantially different in part to the tentative rulings issued in the July 12, 2018 Civil Minutes ("MSJ Tentative I"), Docket No. 788 and in the August 3, 2018 Civil Minutes ("MSJ Tentative II), Docket No. 792. The Court has made the most significant modifications to the procedural history portion in Section I.B, the analysis in Section IV, and the conclusion in the now labeled Section V. The Court's prior rulings were merely *tentative* rulings, and this ruling replaces them and supersedes them in every way following reexamination of the original and supplemental briefing.

[2] "Plaintiffs" are: Alcoa, Inc.; Alpha Therapeutic Corp.; Applied Micro Circuits Corp.; Arlon, LLC; Astro Aluminum Treating Co., Inc.; BASF Corp.; Baxter Healthcare Corp.; Cal-Tape & Label Co.; California Hydroforming Company, Inc.; Cintas Corp.; Columbia Showcase & Cabinet Company, Inc.; County of Los Angeles; Crosby & Overton, Inc.; Disney Enterprises, Inc.; FHL Group; Forenco, Inc.; General Dynamics Corp.; Gulfstream Aerospace Corp.; Hercules, Inc.; Hexcel Corp.; Honeywell International, Inc.; Ingersoll-Rand Co.; International Paper Co.; Johns Manville; Kimberly-Clark Worldwide, Inc.; Kinder Morgan Liquids Terminals, LLC; Los Angeles County Metropolitan Transportation Authority; Masco Corp. of Indiana; Mattel, Inc.; Merck Sharp & Dohme Corp.; NBC Universal Media, LLC; Pacific Bell Telephone Co.; Pilkington Group Ltd; Quest Diagnostics Clinical Laboratories, Inc.; Raytheon Co.; Rio Tinto AUM Co.; Safety-Kleen Systems, Inc.; Scripto-Tokai Corp.; Sempra Global; Shiley, LLC; Signet Armorlite, Inc.; Soco West, Inc.; Sonoco Products Co.; Sparton Technology, Inc.; Texaco Inc.; Texas Instruments, Inc.; The Boeing Co.; The Dow Chemical Co.; The Regents of the University of California; The Sherwin-Williams Co.; Trane U.S., Inc.; TriMas Corp.; Union Oil Co. of California; Univar USA, Inc.; Universal City Studios, LLC; and Yort, Inc.

[3] "Defendants" are: APC Investment Co.; Associated Plating Co.; Associated Plating Co., Inc. (fka Associated Plating Acquisition Corp.); Bodycote Thermal Processing, Inc.; Burke Street, LLC; Powerine Oil Co.; Continental Heat Treating, Inc.; Continental Development Company, LP; Claudette Earl, an individual; Earl Mfg. Co., Inc.; ExxonMobil Oil Corp.; Ferro Corp.; Firmenich, Inc.; Foss Plating Co., Inc.; Gordon E. McCann, an individual; Lynnea R. McCann, an individual; Darrell K. Golnick, an individual; Clare S. Golnick, an individual; Cheryl A. Golnick, an individual; Kekropia, Inc.; Mission Linen Supply; Momentive Specialty Chemicals, Inc.; William K. Palley, an individual; Palley Supply Co.; Palmtree Acquisition Corp.; Phibro-Tech, Inc.; Pilot Chemical Corp.; PMC Specialties Group, Inc.; Union Pacific Railroad Co.; First Dice Road Co.; and Halliburton Affiliates, LLC.

[4] The Court provides a brief synopsis of the allegations in the 5AC to provide a contextual foundation for this motion.

contamination at the Omega Chemical Superfund Site located in Whittier and Santa Fe Springs, California, which the Environmental Protection Agency (the "EPA") has designated as "Operable Unit No. 2" ("OU2" or the "OU2 Site" or the "OU2 Facility"). *See* 5AC ¶ 2. The groundwater contamination in OU2 is approximately 4.5 miles long. *See id.* Defendants owned properties, operated businesses, or arranged for treatment of waste at businesses sitting near or atop the OU2 Facility at which hazardous substances and waste (including hexavalent chromium and other solvents) spilled or discharged onto the ground and made their way into the soil and groundwater. *See id.* ¶ 3. As a result, the soil and groundwater have been contaminated; and there are multiple plumes of contamination blending together into regional groundwater contamination. *See id.*

The EPA evaluated many Defendants in connection with the OU2 Facility and declared some of them "potentially responsible parties" ("PRPs"), warranting the receipt of a Special Notice Letter ("SNL") from the EPA. *See id.* ¶ 4. The EPA identified in the SNLs certain defendants ("SNL Defendants") who were potentially liable under CERCLA Section 107 for the OU2 groundwater contamination and for past and future costs to clean up that contamination. *See id.* The SNLs also provided information supporting those conclusions and solicited offers from the SNL Defendants to take remedial action and design remedial action as to OU2. *See id.* The EPA issued General Notice Letters ("GNLs") to other PRP Defendants ("GNL Defendants") that were potentially liable for cleanup costs at the Omega Superfund Site, inviting the GNL Defendants to explain why they should *not* receive an SNL. *See id.* ¶ 5.

Plaintiffs in this action are companies that allegedly sent chemicals to Omega Chemical Corporation ("Omega Chemical") in Whittier for appropriate processing and recycling. *See id.* ¶ 7. The EPA asserts that Omega Chemical's failure to properly process, recycle, and dispose of those chemicals resulted in the groundwater contamination and that Plaintiffs are responsible for remediation of the groundwater contamination underneath the Omega Chemical property. *See id.* In addition, the EPA has extended its view of Plaintiffs' responsibility to include the groundwater contamination in OU2. *See id.* ¶ 8. The EPA contends that Plaintiffs are responsible for remediating OU2. *See id.* It has determined that the contaminated groundwater should be contained, extracted, and treated in order to be used in a beneficial manner, which will cost tens of millions of dollars in capital and operating expenditures. *See id.* ¶ 9.

Each Plaintiff has voluntarily incurred significant costs to investigate the sources of OU2

contamination and the remediation of OU2. *See id.* In doing so, Plaintiffs have collectively spent millions of dollars to address these issues and may incur further future expenses regarding response costs. *See id.* Defendants are responsible for releases of hazardous substances into the OU2 groundwater and therefore should bear the costs to clean up that contamination. *See id.* Defendants have failed to implement source control measures to prevent groundwater exceeding healthy levels from leaving source properties as a result of contaminated on-site soils or groundwater. *See id.* ¶ 10. This has led to unsafe groundwater continuing to migrate into OU2, swelling costs and the duration of cleanup efforts. *See id.*

In this action, Plaintiffs seek recovery from Defendants of necessary response costs that Plaintiffs have already incurred and will continue to incur due to the release or threatened release of hazardous substances contaminating OU2 groundwater. *See id.* ¶ 11. Plaintiffs also seek declaratory judgment that Defendants are liable for *future* response costs or damages binding on any subsequent actions for recovery of response costs or damages. *See id.* Plaintiffs further endeavor to enjoin certain Defendants from continuing to release hazardous substances emanating from source properties that those Defendants own or operate and to force those Defendants to remediate soil and groundwater contamination to control the spread of hazardous substances in OU2. *See id.*

### B. Procedural Background

At the outset, the Court notes that the statutory grounds for the claims in this lawsuit have shifted over time. In the original Complaint, Plaintiffs sought the recovery of costs under CERCLA § 107. *See* Complaint ¶¶ 308-331, Docket No. 1. Though the Complaint mentioned CERCLA § 113 in the declaratory judgment claim, the Complaint did not allege a contribution action under Section 113(f). *See id.* ¶¶ 332-336. The first appearance of a contribution claim under CERCLA § 113(f) seemed to arise in the June 13, 2016 filing of the Fourth Amended Complaint ("4AC"), Docket No. 489, wherein Plaintiffs pursued claims for both cost recovery under CERCLA § 107 and contribution under CERCLA § 113(f), among others. *See* 4AC ¶¶ 396-429. By the 5AC's filing on November 1, 2016, the CERCLA § 107 cost recovery claims for relief were no longer included in the pleading; instead, the CERCLA § 113(f) contribution claim was included along with an RCRA § 7002 cause of action and a claim for declaratory relief as to liability under CERCLA § 113(f) for contribution. *See* 5AC ¶¶ 396-426.

On April 30, 2018, Moving Defendants[5] filed a motion for summary judgment to dismiss the first and third causes of action on statute of limitations grounds; they provided a notice of errata on May 1, 2018, attaching the motion for summary judgment and a Tab A attached to it with certain illustrative maps located therein.  *See* Moving Defendants' Notice of Motion and Motion for Summary Judgment Re: Statute of Limitations ("MSJ" or "Motion"), Docket No. 754-1; *see id.* Tab A ("Maps"), Docket No. 754-2.[6]   Plaintiffs filed an opposition to the MSJ.[7] *See* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment Re: Statute of Limitations ("Opp'n"), Docket No. 770.  Moving Defendants filed a reply in support of the MSJ ("Reply," Docket No. 779) and a "Response to Statement of Uncontroverted Material Facts" ("DRSUF," Docket No. 780.[8]

On July 12, 2018 the Court issued its tentative ruling as to the MSJ, indicating its inclination to deny the motion.  *See* July 12, 2018 Civil Minutes ("MSJ Tentative I"), Docket No. 788.  During the hearing on that motion, the Court asked for an itemization of "what the [OU2 response costs] generally are and the source of those amounts . . . . the expenditures that [Plaintiffs] have and to the extent that [Plaintiffs] know what they are now . . . ."  *See* July 12, 2018 Hr. Tr. at 19:5-17.  The Court also granted the request for the submission of supplemental briefing from each side.  *See id.* 21:22-24.  Plaintiffs filed their supplemental briefing.  *See* Plaintiffs' Supplemental Brief in Opposition to MSJ ("Pls.' Supp. I"), Docket No. 789.  They

---

[5] "Moving Defendants" are: Associated Plating Company, Associated Plating Company, Inc., Gordon E. McCann, Lynnea R. McCann, Darrell K. Golnick, Clare S. Golnick, Cheryl A. Golnick, Bodycote Thermal Processing, Claudette Earl, Earl Manufacturing Company, Inc., Halliburton Affiliates, Fireman's Fund Insurance Company and Federal Insurance Company Interveners for Palley Supply Company, Ferro Corporation, PMC Specialties Group, Inc., Palmtree Acquisition Corporation, Phibro-Tech and First Dice Road Company, Foss Plating Company, and Union Pacific Railroad Company.

[6] Moving Defendants move for summary judgment as to Plaintiffs' first and third claims for relief, arguing that the three-year statute of limitations in 42 U.S.C. § 9613(g)(3)(B) bars them.  *See* MSJ at 18-25.  In the 5AC, Plaintiffs style the first claim for relief as "Contribution Under CERCLA," alleged against all Defendants except for Burke Street LLC.  *See* 5AC ¶¶ 396-407.  The third claim for relief is labeled as "Declaratory Judgment Under Federal Law," alleged against all Defendants except Burke Street LLC.  *See id.* ¶¶ 424-426.

[7] As part of Plaintiffs' Opposition, they filed a request for judicial notice.  *See* Plaintiffs' Request for Judicial Notice in Support of Opposition to MSJ ("Pls.' RJN"), Docket No. 770-1.  Moving Defendants do not appear to have objected to Plaintiffs' RJN.  *See* Docket.  The Court finds the exhibits attached to Plaintiffs' RJN to be appropriate for judicial notice as per Fed. R. Evid. 201.  Moving Defendants also filed a request for judicial notice of a complaint in a prior related action.  *See* Moving Defendants' Request for Judicial Notice in Support of MSJ ("Defs.' RJN"), Docket No. 785.  Moving Defendants' RJN is fit for judicial notice as per Fed. R. Evid. 201.

[8] In support of the Reply, Moving Defendants filed a request for judicial notice.  *See* Moving Defendants' Request for Judicial Notice in Support of Their Reply ("Defs.' RJN"), Docket No. 785.  The Court finds the single exhibit, a complaint filed in a different proceeding, fit for judicial notice.

attach what they label a Timeline of OU2 Activities and OPOG Costs ("Costs Timeline"), Docket No. 789-1.  Moving Defendants filed a supplemental reply brief.  *See* Moving Defendants' Reply to Plaintiffs' Offer of Proof Re: Costs Barred by the Statute of Limitations ("Defs.' Supp. I"), Docket No. 790.  The Court heard oral argument on the MSJ again on August 6, 2018 and issued another tentative ruling three days prior.  *See* Aug. 3, 2018 Civil Minutes ("MSJ Tentative II"), Docket No. 792.  On September 21, 2018 and September 28, 2018, the parties submitted additional briefing.  *See generally* Moving Defendants' Post-Argument Brief, Docket No. 802 ("Defs.' Supp. II"); Plaintiffs' Response to Defendants' Post-Argument Brief Re: Statute of Limitations ("Pls.' Supp. II"), Docket No. 804.

### C.  Statutory Context

The Ninth Circuit provided a helpful statutory overview of CERCLA in *Asarco LLC v. Atl. Richfield Co.*, 866 F.3d 1108 (9th Cir. 2017), stating as follows:

> Congress enacted CERCLA in 1980 with two goals in mind: (i) to encourage the "'expeditious and efficient cleanup of hazardous waste sites,'" and (ii) to ensure that those responsible for hazardous waste contamination pay for the cleanup.  *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 880 (9th Cir. 2001) (en banc) (quoting *Pritikin v. Dep't of Energy*, 254 F.3d 791, 795 (9th Cir. 2001)); *see* S. Rep. No. 96–848, at 13 (1980).  Hazardous waste sites − also known as Superfund sites − contain toxic substances often deposited by multiple entities.  *See* 42 U.S.C. § 9607(a)(1)-(4).  In order to spread responsibility among those entities, Congress included a provision in CERCLA providing for reimbursement of costs incurred by the government or a liable PRP. Section 107(a) provides a cause of action for a "cost recovery" claim against PRPs for a wide range of expenses, including "'any . . . necessary costs of response incurred'" that result from a release of a hazardous substance.  *Whittaker Corp. v. United States*, 825 F.3d 1002, 1006 (9th Cir. 2016) (quoting 42 U.S.C. § 9607(a)).
>
> "Response" is a term of art under CERCLA and means "remove, removal, remedy, and remedial action."  42 U.S.C. § 9601(25). Congress even gave those defining terms their own definitions.  A "removal" means, *inter alia*, "the cleanup or removal of released hazardous substances from the environment" and any actions that may be necessary "in the event of the threat of release of hazardous substances into the environment."  *Id.* § 9601(23).  A "remedial action" means, *inter alia*, "actions consistent with permanent remedy taken instead of or in addition to removal actions . . . to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment."  *Id.* § 9601(24).  Put simply, a "response action" covers a broad array of cleanup activities.
>
> Section 107(a) is limited to recovery of response costs the suing PRP itself directly incurred.  *See Atl. Research*, 551 U.S. at 139, 127 S.Ct. 2331 ("[Section] 107(a) permits recovery of cleanup costs but does not create a right to

contribution."). At the time of enactment, CERCLA included no express right to contribution for a PRP that did not itself incur response costs, but that reimbursed another party that did incur response costs. *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 162, 125 S.Ct. 577, 160 L.Ed.2d 548 (2004). Such a situation arises under two circumstances: (i) where the PRP is the defendant in a CERCLA § 106 or § 107(a) action and a money judgment issues against it; or, as with the CERCLA Decree in the matter before us, (ii) where the PRP pays the United States' or a State's response costs pursuant to a settlement agreement. *See id.* at 160–61, 125 S.Ct. 577; *Atl. Research*, 551 U.S. at 138–39, 127 S.Ct. 2331; *Whittaker*, 825 F.3d at 1006–07.

Congress added an express right to contribution with the Superfund Amendments and Reauthorization Act of 1986 ("1986 CERCLA Amendments"), Pub. L. No. 99-499, to address these two circumstances. *See Atl. Research*, 551 U.S. at 132, 127 S.Ct. 2331. Section 113(f)(1) captures the first, and provides that "[a]ny person may seek contribution from any other person who is liable or potentially liable under [§ 107(a)] of this title, during or following any civil action . . . under [§ 106 or § 107(a)] of this title." 42 U.S.C. § 9613(f)(1) . . . . Section 113(f)(3)(B), which is directly at issue [in *Atl. Richfield*], captures the second scenario, and provides that

> [a] person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement [that immunizes such person from a contribution action].

*Id.* § 9613(f)(3)(B). In other words, "a PRP that pays money to satisfy a settlement agreement or a court judgment may pursue § 113(f) contribution." *Atl. Research*, 551 U.S. at 139, 127 S.Ct. 2331; *see Cooper*, 543 U.S. at 163, 167, 125 S.Ct. 577 (recognizing that § 113(f)(1) and § 113(f)(3)(B) set forth separate rights of contribution).

While § 107(a) cost recovery actions and § 113(f) contribution actions offer "complementary yet distinct" remedies, there is overlap between them. *Atl. Research*, 551 U.S. at 138, 139 n.6, 127 S.Ct. 2331. For example, a PRP may undertake its own response actions pursuant to a settlement agreement with the government. *See id.* That PRP will have incurred its own response costs, meaning it is eligible for cost recovery under § 107(a), but it has also settled with the government, giving rise to a contribution action under § 113(f)(3)(B). The question is whether both or only one of these avenues of relief is available. Our circuit, and "every federal court of appeals to have considered the question since *Atlantic Research*," has concluded that "a party who *may* bring a contribution action for certain expenses *must* use the contribution action [under § 113(f)(3)(B)], even if a cost recovery action [under § 107(a)] would otherwise be available." *Whittaker*, 825 F.3d at 1007 (emphasis in original); *see, e.g., Bernstein v. Bankert*, 733 F.3d 190, 206 (7th Cir. 2013) (party may not pursue

cost recovery claim where a contribution claim is available); *Solutia, Inc. v. McWane, Inc.*, 672 F.3d 1230, 1236–37 (11th Cir. 2012) (same); *Morrison Enters., LLC v. Dravo Corp.*, 638 F.3d 594, 603–04 (8th Cir. 2011) (same); *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 229 (3d Cir. 2010) (same); *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 128 (2d Cir. 2010) (same); *ITT Indus., Inc. v. BorgWarner, Inc.*, 506 F.3d 452, 458 (6th Cir. 2007) (same). Thus, a PRP that incurs its own response costs pursuant to a settlement agreement may only bring a claim for contribution.

Sections 107(a) and 113(f) have different statutes of limitations periods. An action for "recovery of . . . costs" under § 107(a) "must be commenced . . . within 6 years after initiation of physical on-site construction of the remedial action" or "within 3 years after the completion of the removal action." 42 U.S.C. § 9613(g)(2)(A), (B). An action for contribution of "response costs or damages" under § 113(f), by contrast, "may be commenced" no more than "3 years after . . . the date of . . . entry of a judicially approved settlement with respect to such costs or damages." *Id.* § 9613(g)(3)(B). The shorter three-year limitations period for contribution actions is intended "to ensure that the responsible parties get to the bargaining − and clean-up − table sooner rather than later." *RSR Corp. v. Commercial Metals Co.*, 496 F.3d 552, 559 (6th Cir. 2007); *see Whittaker*, 825 F.3d at 1013 (Owens, J., concurring in part) (observing that § 113(f) was intended to " 'bring[ ] all such responsible parties to the bargaining table at an early date' " (quoting H.R. Rep. (Energy and Commerce Committee) No. 99–253, pt. 1, at 80 (1985), *reprinted in* 1986 U.S.C.C.A.N. 2835, 2862)).

*See Atl. Richfield*, 866 F.3d at 1115-1117 (internal footnotes omitted).

CERCLA § 113(g)(3) provides:

No action for contribution for any response costs or damages may be commenced more than 3 years after –

> **(A)** the date of judgment in any action under this chapter for recovery of such costs or damages, or

> **(B)** the date of an administrative order under section 9622(g) of this title (relating to de minimis settlements) or 9622(h) of this title (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to such costs or damages.

*See* 42 U.S.C. § 9613(g)(3).

## II.  Underlying Facts[9]

---

[9] Some of the underlying "undisputed" facts cited herein have been disputed by Plaintiffs or Moving Defendants. The Court has reviewed such disputes and has included in this summary only facts that are supported by the cited evidence, altering the proffered facts if necessary to accurately reflect the uncontroverted evidence. To the extent that the cited underlying "undisputed" facts have been disputed, the Court finds that the stated disputes: (1) fail to controvert the proffered "undisputed" facts, (2) dispute the facts on grounds not germane to the below statements, and/or (3) fail to cite evidence in support of the disputing party's position. As such, the Court treats such facts as undisputed. Any proffered facts not included in this Tentative Ruling were found to be: (1) improper

### A. The Site

This lawsuit pertains to a 4.5 mile plume of contaminated groundwater situated south/southwest of the former Omega Chemical Corporation processing plant in Whittier, referred to as OU2 of the Omega Superfund Site.[10]  DRSUF ¶ 1; 5AC ¶ 2.  In 1995, the EPA issued a Unilateral Administrative Order ("UAO") requiring the UAO Respondents[11] to "undertake and complete removal activities to abate an imminent and substantial endangerment to the public health, welfare, or the environment."  *See* Declaration of Robert P. Doty in Support of Moving Defendants' Motion for Summary Judgment ("Doty Decl.") Ex. 7 at 2, Docket No. 744.[12]  The EPA addressed the UAO to Omega Chemical, its owner, and over 100 Omega Property Generators ("Generators"), which comprised of entities that sent chemicals to the Omega Facility for recycling or reclamation.  *See id.* at 3-4; Declaration of Gene A. Lucero in Support of Plaintiffs' Opposition to MSJ ("Lucero Decl.") ¶ 6, Docket No. 770-18.  A portion of those public and private Generators formed the Omega Chemical Potentially Responsible Parties Organized Group ("OPOG") to work together with government regulators and Omega Chemical to evaluate the need for and perform necessary response actions at the Omega Facility.  *See* Lucero Decl. ¶ 4.  Plaintiffs in this lawsuit are included among the members of OPOG.  *See id.* ¶ 5.  The EPA identified Plaintiffs and certain Defendants in this action as jointly and severally liable for the regional groundwater contamination at the Omega Superfund Site designated as OU2.[13]  *See* DRSUF ¶ 2.

---

opinions or conclusions rather than facts, (2) were unsupported by admissible evidence, (3) were deemed irrelevant to the Court's present analysis, or (4) some combination thereof.

[10] Many of Moving Defendants' uncontroverted facts and supporting evidence are mere allegations in the 5AC.  *See generally* Moving Defendants' Statement of Uncontroverted Material Facts and Conclusions of Law in Support of MSJ, Docket No. 742.  Generally, to the extent the statements merely regurgitate what Plaintiffs allege, they will not be repeated here but are instead located in the background section above.

[11] The UAO Respondents were listed in Appendices A and B of the UAO.  *See* Doty Decl. Ex. 7 at 1, 21-32.  Not all of the Plaintiffs in this case are listed as UAO Respondents (and vice versa) in the UAO.

[12] This page number refers to the pagination at the bottom right of the exhibit.  All other page numbers for exhibits refer to that pagination unless noted otherwise.  Rather than listing the docket numbers for each exhibit, the Court will list the exhibits and corresponding dockets here.  As to the exhibits attached to the Doty Declaration, Exhibits 1 through 5 are at Docket No. 745; Exhibits 6 through 6A are at Docket No. 746; Exhibits 7 through 13A are at Docket No. 747; Exhibits 14-16 are at Docket No. 748; Exhibits 18-20 are at Docket No. 749; Exhibits 21-28 are at Docket No. 750; Exhibits 29-32 are at Docket No. 751.

[13] Exhibit 4 to the Doty Declaration does not state the quoted language in DRSUF ¶ 2, but based on Plaintiffs' response and Moving Defendants' reply, this statement seems to constitute the overlapping undisputed statement of both parties.

### B. Response Costs

Plaintiffs have incurred significant costs to investigate the sources and the remediation of the OU2 Facility. *See* DRSUF ¶ 8; 5AC ¶ 9. This has amounted to millions of dollars. *See id.* Remedying the situation will require tens of millions of dollars in capital and operating expenditures for years to come. *See id.* Possible groundwater treatment technologies for the remediation, as described in a 2016 EPA fact sheet, include extraction wells, conveyance piping, and treatment equipment.[14] *See* Doty Decl. Ex. 5 at pg. 6 Fig. 3.

### C. Relevant Settlements

*1. The 2000 Action and the Related 2001 Consent Decree*

In 2000, in *United States v. Abex Aerospace Division*, Case No. 00-cv-12471-TJH-(JWJx) ("2000 Action"), Plaintiff United States sued a number of defendants[15] under CERCLA Sections 106 and 107, seeking: (1) reimbursement of costs incurred by the EPA and the Department of Justice for response actions at the Omega Chemical Corporation Superfund Site in Whittier, California and (2) seeking performance of studies and "Work" by the "Settling Work Defendants"[16] at the Omega Site consistent with the National Contingency Plan ("NCP"). *See* Doty Decl. Ex. 13 at 4 (summarizing the complaint in that action). The complaint in the 2000 Action alleged that the United States had incurred at least $554,189 in response costs for responding to the release or threatened release of hazardous substances at the former hazardous waste treatment and storage facility of Omega Chemical Corporation. *See* Defs.' RJN Ex. A ¶ 6, 11. On February 28, 2001, Judge Terry J. Hatter ("Judge Hatter") entered an order approving a consent decree ("2001 CD") between the United States and certain settling defendants. *See generally* Doty Decl. Ex. 13. The 2001 CD provided that "[t]he Settling Work Defendants will

---

[14] Jack Keener, who has "knowledge and experience as Project Manager and Project Coordinator" provided information about the amounts and descriptions of costs incurred by OPOG relating to OU2 in each of the years between 2001 and 2018, which has been incorporated into the Costs Timeline. *See* Declaration of Jack Keener in Support of Plaintiffs' Opp'n, Docket No. 789-3.

[15] Defendants in that case are delineated on the first three pages of the 2001 Consent Decree and on the first three pages of the complaint in that matter. *See* Doty Decl. Ex. 13 at 1-3; *see also* Defs.' RJN Ex. A at 1-3, Docket No. 785.

[16] "Settling Work Defendants" is defined in the 2001 Consent Decree as "those parties identified in Appendix D, who are signatories to this Consent Decree, who are required to perform the Work, whether they perform the Work by themselves or through any legal entity that they may establish to perform the Work." *See* Doty. Decl. Ex. 13 at 8. Appendix D does not seem to appear in the materials provided by either party. *See* Docket.

install three sentinel groundwater monitoring wells at two or three locations downgradient of Phase 1a Area and upgradient of Water Supply Well 30R3." *See* Doty Decl. Ex. 13 at 49 (Task 3). The other two tasks required under the 2001 CD were: (1) the design and implementation of "a groundwater containment and mass removal treatment system in the Phase 1a Area" and (2) the implementation of a "Remedial Investigation/Feasibility Study ("RI/FS") at the Omega property for vadose zone contamination that has resulted from the release of hazardous substances on, at, or emanating from the Omega property." *See id.* at 44-49 (Tasks 1 and 2).

### 2. The 2004 Action and the Related 2007 Settlement

In 2004, in the case of *Omega Chemical PRP Group LLC v. Aeroscientific Corp.*, Case No. 04-cv-1340-TJH-(JWJx) ("2004 Action"), Omega Chemical PRP Group LLC sued over 200 defendants who were allegedly responsible for hazardous substances stored, treated, or disposed of at the Omega Site. *See* Doty Decl. Ex. 6 at 1. In February 2004, plaintiffs in that action filed a complaint alleging: (1) contribution under CERCLA against non-federal defendants and (2) contribution under CERCLA against federal defendants. *See generally* Doty Decl. Ex. 18 ("2004 Complaint"). Those plaintiffs sought to recover response costs incurred in connection with the Omega Site pursuant to CERCLA Sections 107 and 113.[17] *See id.* Approval of another settlement was entered on March 9, 2007 ("2007 Settlement") but in relation to the 2004 Action. *See generally* Doty Decl. Ex. 23. As part of an effort to establish that this was a good faith settlement, two declarations referenced an EPA $101.5 million cost estimate. *See* DRSUF ¶ 18; Doty Decl. Ex. 22 ¶ 10; *see id.* Ex. 24 ¶ 6. This cost estimate derives from a 2004 EPA memorandum ("2004 Cost Estimate Memo") by Dr. Tom Perina ("Dr. Perina" or "Perina"). *See* DRSUF ¶ 19; *see generally* Doty Decl. Ex. 19. In the 2004 Cost Estimate Memo, Dr. Perina described the groundwater as containing contamination dissolved within it over an area of at least 2.5 miles long and .75 miles wide (the "plume"). *Id.*, Ex. 19 at 2. The 2004 Cost Estimate Memo assumed extraction and treatment of contaminated groundwater as the presumptive remedies for the site − characterized as "pump and treat" using a complex treatment train to address chemicals in the plume. *See id.* at 2-3. This estimate included wells, water conveyance pipelines, and a treatment plant as components of the conceptual remediation system. *See id.* at 3. The pump and treat system would operate for 30 years with soil remediation taking 3 years.

---

[17] In more detail, the plaintiffs in the 2004 Complaint sought the relief delineated at pages 28-29 of Doty Decl. Ex. 18 (page numbers used for this citation are at the bottom right-hand side of the exhibit).

*See id.* Hexavalent chromium and PCE (tetrachloroethylene) were therein identified as contaminants detected in the Omega Site, with the 2004 Cost Estimate Memo noting that other contaminants may be identified in the future. *See id.* at 2-3. Dr. Perina estimated that soil remediation costs with a 3.1% discount rate would add up to $3.9 million and groundwater pump and treat costs would amount to $97.5 million. *See id.* at pg. 5 Table 1. In a 2005 EPA fact sheet and EPA memo, $6.4 million is the estimate for the cost of pumping and treating OU-1's groundwater. *See* DRSUF ¶ 26; Doty Decl. Ex. 26 at 3. Eliminating that $6.4 million figure from the $97.5 million figure amounts to $91.1 million for pumping and treating.

The 2007 Settlement, in Section 2.03, defines "Claims or Claims and Liabilities" as:

[A]ny and all claims (including without limitation all contribution claims in litigation or arbitration), losses, demands, causes of action, obligations, direct or consequential damages, injuries, liens, costs (including without limitation reimbursement of government response costs and legal costs), civil fines, penalties, expenses, fees and liabilities of any nature whatsoever (including without limitation attorneys' fees), whether contractual, statutory, equitable or under common law, whether known or unknown, whether accrued or unaccrued, that are based on or arise from the Site.

*See* Doty Decl. Ex. 6A § 2.03. "Site" is defined as "the Omega Chemical Corporation Superfund Site listed on the National Priorities List on January 19, 1999, 64 Fed. Reg. 2945." *See id.* § 2.19.

The 2007 Settlement provides for a release of "Settled Matters." *See id.* § 5.01. Section 5.02 sets out "Excluded Matters" from the 2007 Settlement, and for a claim or liability arising from the Site to be excluded it must *not* be for Regional Response Work. *See id.* § 5.02(j). "Regional Response Work" is defined under the 2007 Settlement as "work that the Governments require the Parties, or any one of them to perform, or which they perform at the request or demand of the Governments or any one of them, regarding regional groundwater contamination alleged to be attributed to the Site." *See id.* § 2.16. In other words, Regional Response Work is not considered one of the Excluded Matters. *See id.* Except for Excluded Matters and certain ministerial tasks, and pursuant to terms and conditions in the 2007 Settlement, OPOG and Omega Chemical PRP Group LLC assumed "each Settling Party's responsibilities for the Site, including, but not limited to, all the response costs associated with the Site." *See id.* 3.01(a).

Sections 5.03 and 6.01 of the 2007 Settlement preserve certain rights to additional

recovery by the Group[18] against some of the settling defendants and third parties.  *See id.* §§ 5.03, 6.01.  The Group could recover additional payments of the amount by which Total Collective Costs exceed $70 million, not to exceed the settling party's share of $93 million.  *See* Doty Decl. Ex. 6A § 5.03.  "Total Collective Costs" are defined in the 2007 Settlement as "total Site response costs that have been or are in the future expended by the Group and the Settling Parties."  *See id.* § 2.21.  Those costs include costs attributable to "PRPs the Group has or does otherwise settle with . . . [and] PRPs from whom the Group recovers through litigation to judgment."  *See id.* § 2.21.

As part of the papers arguing to Judge Hatter that the 2007 Settlement was a good faith settlement, the memorandum in support thereof stated that the 2007 Settlement resolves the settling parties' "claims against each other with regard to their responsibilities for the Omega Site, including claims for response costs under the completed UAO 95-15 work, Phase 1a Response work called for under the Consent Decree, as amended, and any future Regional Response Work, except as specifically limited in the [2007] Settlement Agreement."  *See* Doty Decl. Ex. 6 at 4-5.

### 3. The 2010 Action and the Related 2010 Consent Decree

In 2010 in the case of *United States v. Alcoa Inc.*, Case No. 2:10-cv-05051-TJH-(PLAx) ("2010 Action"), Plaintiff United States sued a number of defendants under CERCLA Section 107 to recover response costs in connection with the Omega Site.  *See generally* Complaint, Case No. 2:10-cv-05051-TJH-PLA Docket No. 1.  The complaint in the 2010 Action alleged that the United States incurred at least $17 million in unreimbursed response costs in responding to the releases or threatened releases of hazardous substances at the former waste treatment and storage facility of Omega Chemical Corporation.  *See id.* ¶¶ 6, 11.

On October 6, 2010, the EPA, settling work defendants ("2010 Settling Work Defendants"), settling cash defendants ("2010 Settling Cash Defendants") and other parties entered into a Consent Decree ("2010 CD").  *See generally* Doty Decl. Ex. 32.  "Site" under the 2010 CD means "the Omega Chemical Corporation Superfund Site, listed on the National Priorities List on January 19, 1999, 64 Fed. Reg. 2950."  *See id.* at 10.  Paragraph 88 of the 2010 CD provides that:

Claims Against *De Minimis* and Ability to Pay Parties.  Settling Defendants agree

---

[18] The 2007 Settlement defines "Group" as OPOG and the Omega Chemical PRP Group LLC.

not to assert any claims or causes of action and to waive all claims or causes of action (including but not limited to claims or causes of action under Sections 107(a) and 113 of CERCLA) that they may have for all matters relating to the Site against any person that has entered or in the future enters into a final CERCLA Section 122(g) *de minimis* settlement, or a final settlement based on limited ability to pay, with EPA with respect to the Site. This waiver shall not apply with respect to any defense, claim, or cause of action that a Settling Defendant may have against any person if such person asserts a claim or cause of action relating to the Site against such Settling Defendant.

*See* Doty Decl. Ex. 32 ¶ 88. Under the 2010 CD, the 2010 Settling Work Defendants would pay $1.5 million toward the EPA's unrecovered costs at the Site, would pay all future response costs not inconsistent with the NCP, and would perform various remedial work as to the Site. *See id.* ¶¶ 9-16, 49-50. The 2010 Settling Cash Defendants had various payment obligations under the 2010 CD. *See id.* ¶¶ 47-48

### 4. The 2016 Action and the Related 2017 Consent Decree

In the 2016 case of *United States v. Abex Aerospace*, Case No. 2:16-cv-02696-GW-(Ex) ("2016 Action"), the United States and the State of California on behalf of the Department of Toxic Substances Control ("DTSC") sued a number of defendants under Sections 106 and 107 of CERCLA and Section 7003 of the RCRA for injunctive relief and recovery of costs associated with the release and threatened release of hazardous substances at OU2 or which have come to be located at OU2. *See* Case No. 2:16-cv-02696-GW-(Ex) Docket No. 1 at pg. i and ¶ 1. The United States alleged it incurred at least $20 million in unreimbursed response costs in responding to hazardous substances or threatened hazardous substances at or in route to OU2. *See id.* ¶ 18. Plaintiffs' response actions allegedly included remedial investigation, oversight of work by certain defendants, community relations activities, and preparation feasibility studies and decision documents. *See id.*

In 2017, the Court entered a consent decree ("2017 CD") putting an end to the 2016 Action. *See* Order to Enter Consent Decree, Case No. 2:16-cv-02696-GW-(Ex) Docket No. 41. The 2017 CD bound the plaintiffs in that action and certain defendants ("2017 Settling Defendants").[19] *See* Corrected Consent Decree ¶ 2, Case No. 2:16-cv-02696-GW-(Ex) Docket No. 19-1. The 2017 CD required the Settling Work Defendants to make cash payments to the United States and the DTSC in the amount of $8 million and $70,000 for past response costs,

---

[19] The 2017 Settling Defendants comprised of entities listed in Appendix D and E of the 2017 CD. *See* 2017 CD at CM/ECF pgs. 330-338, Case No. 2:16-cv-02696-GW-(Ex) Docket No. 19-1.

respectively. *See id.* ¶ 28. Additionally, the 2017 Settling Work Defendants agreed to pay all future response costs incurred by the EPA and DTSC in overseeing the response actions covered by the 2017 CD, as well as a performance guarantee of $70 million, which is the estimated cost of the "Work." *See id.* ¶¶ 21, 29. The Work was to include groundwater extraction and treatment in the Northern Extraction Area, Central Extraction Area, and a portion of the Leading Edge Area of the OU2 plume. *See id.* ¶¶ O-P. The Work also was to include investigative work to assist the EPA in determining the appropriate remainder of the response efforts. *See id.* In exchange for entering the 2017 CD, all 2017 Settling Defendants received covenants not to sue under CERCLA §§ 106 and 107, as well as RCRA § 7003 and parallel state provisions, for the entirety of Plaintiffs' past OU2 response costs and the Work required by the 2017 CD. *See id.* ¶¶ 59-60. The 2017 Settling Defendants are also entitled to contribution protection under CERCLA § 113(f)(2) for the "matters addressed" in the 2017 CD. *See id.* ¶¶ 4, 81.

## III. **MSJ Legal Standard**

Summary judgment is proper when the pleadings, the discovery and disclosed materials on file, including any affidavits/declarations, show that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[20] Fed. R. Civ. P. 56; *see also Miranda v. City of Cornelius*, 429 F.3d 858, 860 n.1 (9th Cir. 2005). To satisfy its burden at summary judgment, a moving party *with* the burden of persuasion must establish "beyond controversy every essential element of its [claim or defense]." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003). By contrast, a moving party *without* the burden of persuasion "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment, [but instead] must set forth, by affidavit or as otherwise provided in Rule 56,

---

[20] Under Federal Rule of Civil Procedure 56, the same legal standard applies to motions for partial summary judgment and to ordinary motions for summary judgment. *See* Fed. R. Civ. P. 56(a): *see also California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998); *Barnes v. Cnty. of Placer*, 654 F.Supp.2d 1066, 1070 (E.D. Cal. 2009), *aff'd*, 386 F.App'x 633 (9th Cir. 2010) ("A motion for partial summary judgment is resolved under the same standard as a motion for summary judgment.").

*specific facts* showing that there is a genuine issue for trial. *T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (internal citations and quotation marks omitted, emphasis in original) (citing, among other cases, *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

"A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009). In addition, the evidence presented by the parties must be admissible. *See* Fed. R. Civ. P. 56(e); *see also Pelletier v. Fed. Home Loan Bank of S.F.*, 968 F.2d 865, 872 (9th Cir. 1992) (to survive summary judgment, the non-movant party "ordinarily must furnish affidavits containing admissible evidence tending to show the existence of a genuine dispute of material fact"). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). With that said, courts do not make credibility determinations or weigh conflicting evidence at the summary judgment stage, and must view all evidence and draw all inferences in the light most favorable to the non-moving party. *See T.W. Elec.*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *see also Motley v. Parks*, 432 F.3d 1072, 1075, n.1 (9th Cir. 2005) (en banc).

## IV. Discussion

Moving Defendants seek summary judgment as to Plaintiffs' first and third claims for relief,[21] arguing that the three-year statute of limitations in 42 U.S.C. § 9613(g)(3)(B), CERCLA § 113(g)(3)(B) bars them. *See* MSJ at 18-25. Plaintiffs disagree. *See* Opp'n at 11-25. The core of this Motion rests on whether any prior judicially approved settlement or consent decree triggered the statute of limitations, barring the first and third claims for relief in the 5AC.

### A. Applicable Law on the Statute of Limitations

The Ninth Circuit has recognized the complexity of CERCLA, noting that the statute contains a "maze-like structure and baffling language." *California ex rel. Cal. Dep't of Toxic Substances Control v. Neville Chem. Co.*, 358 F.3d 661, 663 (9th Cir. 2004). Nonetheless,

---

[21] In the 5AC, Plaintiffs style the first claim for relief as "Contribution Under CERCLA," alleged against all Defendants except for Burke Street LLC. *See* 5AC ¶¶ 396-407. The third claim for relief is labeled as "Declaratory Judgment Under Federal Law," alleged against all Defendants except Burke Street LLC. *See id.* ¶¶ 424-426. Because the first and third claims for relief are essentially the same, with the third merely adding a declaratory relief element, the Court will analyze them together.

"[w]hile the statutory language may be baffling and the structure maze-like, the statute clearly indicates that *any* contribution claim for particular remedial costs is subject to a three-year statute of limitations once liability for a potentially responsible party ('PRP') becomes recognized through a judicially approved settlement." *ASARCO, LLC v. Celanese Chem. Co.*, 792 F.3d 1203, 1208 (9th Cir. 2015) (citing 42 U.S.C. § 9613(g)(3)(B)). Pursuant to CERCLA § 113, there are two express avenues for contribution:

> § 113(f)(1) ("during or following" specified civil actions) and § 113(f)(3)(B) (after an administrative or judicially approved settlement that resolves liability to the United States or a State). Section 113(g)(3) then provides two corresponding 3-year limitations periods for contribution actions, one beginning at the date of judgment, § 113(g)(3)(A), and one beginning at the date of settlement, § 113(g)(3)(B). . . . [T]o assert a contribution claim under § 113(f), a party must satisfy the conditions of either § 113(f)(1) or § 113(f)(3)(B).

*Cooper Indus.,* 543 U.S. at 167. CERCLA § 113(g)(3), the statute of limitations provision at issue here, reads as follows:

> **(3) Contribution**
>
> No action for contribution for any response costs or damages may be commenced more than 3 years after--
>
> > **(A)** the date of judgment in any action under this chapter for recovery of such costs or damages, or
> >
> > **(B)** the date of an administrative order under section 9622(g) of this title (relating to de minimis settlements) or 9622(h) of this title (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to such costs or damages.

*See* CERCLA § 113(g)(3). The Ninth Circuit has elaborated on the statute of limitations component, providing that:

> The statute of limitations for a contribution claim is triggered by the date upon which the judgment or settlement that underlies the claim is entered. *See id.* When the CERCLA §§ 106 or 107 lawsuit is over and a judgment is entered, the statute of limitations begins to run on the cause of action for contribution that accrued during the pendency of that litigation. *See* 42 U.S.C. § 9613(g)(3)(A). When a person resolves its liability to the United States or a State through an administrative or judicially approved settlement, a right to assert a contribution claim against other PRPs also accrues. *Id.* § 9613(f)(3)(B). Such a settlement starts the clock on the three-year statute of limitations for the contribution claim that accrues on the basis of that settlement. *Id.* § 9613(g)(3)(B).

16

*Celanese*, 792 F.3d at 1210.  Under CERCLA § 113(g)(3)(B), private-party judicially approved settlements also trigger the statute of limitations.  *See id.* at 1211.

The outstanding question is whether the 2007 Settlement constitutes a judicially approved settlement "with respect to" response costs or damages sought in the present action for contribution.  There is no doubt that the 2007 Settlement constitutes a judicially approved settlement within the meaning of CERCLA §113(g)(3).  Therefore, the issue before the Court is merely whether the 2007 Settlement is *with respect to* the response costs or damages sought in this lawsuit.  This inevitably requires a comparison of such costs.

### B. Which Costs Are Sought in This Lawsuit?

It behooves the Court to begin with establishing what response costs or damages are sought in the present action for contribution.  The Court has two primary sources for determining the costs sought here: the 5AC and the Costs Timeline that Plaintiffs provided.  First, in the 5AC, Plaintiffs seek the following:

> (1) ON THE FIRST CLAIM FOR RELIEF, for contribut[i]on for all costs and damages incurred by Plaintiffs, including pre-judgment interest thereon as allowed by law, that exceed Plaintiffs' equitable share of the costs for which Plaintiffs are liable under the OU-2 Consent Decree;
> ***
> (3) ON THE THIRD CLAIM FOR RELIEF, for a judicial declaration that Defendants are liable for their respective equitable shares of all costs and damages incurred by Plaintiffs, including pre-judgment interest thereon as allowed by law, that exceed Plaintiffs' equitable share of the costs for which Plaintiffs are liable under the OU-2 Consent Decree . . . .

*See* 5AC at 102-103.  Paragraph 9 also bears relevance:

> Plaintiffs have each voluntarily incurred significant costs to investigate the sources to, and the remediation of, the OU-2 Facility, collectively spending millions of dollars to address it, and may incur millions of dollars more in future response costs. EPA has determined that the contaminated groundwater should be contained, extracted, and treated so that it can be used in a beneficial manner. This remedy will require tens of millions of dollars in capital and operating expenditures for years to come. Upon information and belief, Defendants are responsible for releases of hazardous substances to the OU-2 Facility groundwater and therefore should bear the costs to clean up the resulting contamination.

*See id.* ¶ 9.

As the second source that the Court draws upon to discern what costs are sought here, Plaintiffs submitted the Costs Timeline.  In the Costs Timeline, Plaintiffs include a three-page

matrix. *See generally* Costs Timeline. That matrix, titled in full as "Timeline of OU2 Activities and OPOG Costs," bears four columns. *See id.* Those columns are titled as follows: (1) Year; (2) Major EPA OU2 Activities; (3) Major OPOG OU2 Activities; and (4) OPOG OU2 Costs. *See id.* Each row represents a period of time (starting in 2001 and ending in 2018). Plaintiffs aver that $16,500,000 in OPOG OU2 costs have been incurred (or that they seek that much in costs). *See id.* at CM/ECF pg. 3. Some of the costs Plaintiffs seek relate to the "data collection on nature and scope of OU2 contamination;" "[d]ata collection on OU2 PRPs;" "work on OU2 RI;" "GNLs for RI;" "EPA work on OU2 RI;" "work on OU2 and [p]roposed [r]emedy;" "comments on draft RI;" "[f]inal OU2 RI/FS and Proposed Remedy Plan for public comment;" "OU2 ROD;" "SNLs with draft OU2 CD and Statement of Work;" "Good Faith Offers;" "negotiations with OPOG on GFO;" "settlement negotiations with OPOG and McKesson;" "[n]egotiations on CD and SOW continue based on term sheet;" and "ongoing oversight of OU2 CD SOW." *See generally* Costs Timeline.

### C. Which Costs Were Covered in the 2007 Settlement?

Next, the Court must establish what costs the 2007 Settlement covers as a point of comparison. The Court applies California principles of contract interpretation in performing this task.[22] From reviewing the 2007 Settlement, it provides for a release of "Settled Matters." *See* Doty Decl. Ex. 6A § 5.01. On the other hand, Section 5.02 sets out "Excluded Matters," and for a claim or liability arising from the Site to be excluded from the settlement it must *not* be for "Regional Response Work." *See id.* § 5.02(j). In other words, Regional Response Work is not considered one of the Excluded Matters and would thus be settled. *See id.* "Regional Response Work" under the settlement means "work that the Governments require the Parties, or any one of them to perform, or which they perform at the request or demand of the Governments or any one of them, regarding regional groundwater contamination alleged to be attributed to the Site." Except for Excluded Matters and certain ministerial tasks, and pursuant to terms and conditions in the 2007 Settlement, OPOG and Omega Chemical PRP Group LLC assumed "each Settling Party's responsibilities for the Site, including, but not limited to, all the response costs associated

---

[22] Pursuant to California law, "the mutual intention of the parties at the time the contract is formed governs interpretation." *AIU Ins. Co. v. Super. Ct.*, 799 P.2d 1253, 1264 (1990) (citing Cal. Civ. Code § 1636). To discern the parties' intent, the Court looks solely to "the written provisions of the contract." *Id.* (citing Cal. Civ. Code § 1639). The Court applies the ordinary meaning of a contract's terms. *Id.*; Cal. Civ. Code § 1644. Regardless of how broad a contract may look, "it extends only to those things concerning which it appears that the parties intended to contract." Cal. Civ. Code § 1648.

with the Site." *See id.* 3.01(a).  The Court would also construe the 2007 Settlement as covering OU2.  To support this interpretation, Section 2.19 defines "Site" as "the Omega Chemical Corporation Superfund Site listed on the National Priorities List on January 19, 1999, 64 Fed. Reg. 2945." *See* Doty Decl. Ex. 6A § 2.19.

Three other documents and/or evidence, among others, contribute to the Court's understanding of what the 2007 Settlement covers.[23]  First, though the 2004 Cost Estimate Memo is not binding, it provides insight into what the 2007 Settlement covered because it had a hand in the Court's approval of that settlement.  Dr. Perina described the groundwater as containing contamination dissolved within it over an area of at least 2.5 miles long and .75 miles wide (the plume).  *See* Doty Decl. Ex. 19 at 2, Docket No. 749.  The 2004 Cost Estimate Memo assumed extraction and treatment of contaminated groundwater as the presumptive remedies for the site, characterized as pump and treat using a complex treatment train to address chemicals in the plume.  *See id.* at 2-3.  This estimate included wells, water conveyance pipelines, and a treatment plant as components of the conceptual remediation system.  *See id.* at 3.  The pump and treat system would operate for 30 years with soil remediation taking 3 years, under this conceptual remedy.  *See id.* at 3.  Hexavalent chromium and PCE (tetrachloroethylene) were therein identified as contaminants detected in the Omega Site, with the memo noting that other contaminants may be identified in the future.  *See id.* at 2-3.  Dr. Perina estimated that soil remediation "Capital and O&M" costs with a 3.1% discount rate would add up to $3.9 million and groundwater pump and treat costs would amount to $97.5 million.  *See* Doty Decl. Ex. 19 at pg. 5 Table 1.  *See generally* Doty Decl. Exs. 6A, 19.  The Court distinguishes this situation from that in *Celanese* where there was a concrete Remedial Action Plan incorporated into the settlement, but the 2004 Cost Estimate Memo nonetheless has some bearing on what the 2007 Settlement covered.  *See Celanese*, 792 F.3d at 1212 (noting that the settlement included an agreement to "undertake site remediation to investigate, monitor, and abate actual or threatened contamination . . . caused by or related to the conditions at the site addressed by the Remedial Action Plan.").  The 2004 Cost Estimate Memo also supports an interpretation that the 2007 Settlement covered OU-2, with a mention that the estimated cost for groundwater included multiple sites downgradient from the Omega processing plant and chemicals not connected to the

---

[23] These documents and/or evidence give the Court context.  The Court's decision rests with the language in the 2007 Settlement, though these documents and/or evidence reaffirm the Court's conclusion.

Omega plant. *See* Doty Decl. Ex. 19 at 2. Second, Albert Cohen ("Mr. Cohen"), an attorney for certain Plaintiffs' counterparties in the 2007 Settlement, testified in his deposition that no representatives of OPOG communicated to him that the "60-80 million dollars' worth of costs EPA's talking about as of 2016" are different than what was "settled back in 2006." *See* Doty Decl. Ex. 27 at exhibit stamped pgs. 5-7. Third, the 2004 Complaint leading to the 2007 Settlement sought recovery of "costs expended and to be expended by . . . Plaintiff OPOG and its members in response to the releases and/or threatened releases of hazardous substances from the *Omega Site*." *See* Doty Decl. Ex. 18 at 28-29 (emphasis added). There was no limitation to OU-1 or exclusion of OU-2. *See id.*

### D. Were the Costs Sought in the Present Action with Respect to Those Covered in the 2007 Settlement?

With the Court identifying above the costs sought in the present action and the costs covered in the 2007 Settlement, the Court can now determine whether the specific response costs sought in the present action are "with respect to" such costs covered in the 2007 Settlement. *See* CERCLA § 113(g)(3). That is the crux of the CERCLA § 113(g)(3) inquiry currently before the Court.

This situation is somewhat similar to that in *Celanese*, and so the Court will address that case here before executing a cost comparison. *Celanese* involved a silver and lead smelter in Contract Costa County. *See ASARCO LLC v. Shore Terminals LLC*, No. C 11-01384 WHA, 2012 WL 2050253, at *1 (N.D. Cal. June 6, 2012), *aff'd sub nom.*, *ASARCO, LLC v. Celanese Chem. Co.*, 792 F.3d 1203 (9th Cir. 2015).[24] As a result of lead and refining operations, a waste product of smelting deposited in ASARCO's land as well as tidelands leased by ASARCO from the California State Lands Commission. *See id.* A company named Wickland Oil Company purchased ASARCO's portion of the site. *See id.* Wickland Oil Company subsequently commenced litigation against ASARCO and the California State Lands Commission. *See id.* at *2. In 1989, the parties entered into a judicially approved settlement where the parties undertook two broad categories of remediation costs. *See id.* One category included four "Interim Remedial Measures," among other things, with each party assuming one third of the cost responsibility. *See id.* at *2. The other category included "other remediation costs" such as

---

[24] The Court uses the case name "*Celanese*" to refer to the entire litigation, both at the district court level and in the subsequent appeal to the Ninth Circuit. Any citation to "2012 WL 2050253" refers to the district court decision whereas the citation to "792 F.3d 1203" refers to the Circuit decision.

future costs for remediation measures necessary and appropriate and costs associated with reimbursement of a government agency for costs incurred in connection with site remediation. *See id.* ASARCO filed the action in March 2011 against certain defendants not party to the 1989 settlement, seeking contribution under Section 113(f) for costs ASARCO incurred. *See id.* at *3. Ultimately, in *Celanese*, the district court held that the 1989 settlement's terms covered the costs in the contribution action, barring recovery beyond the three-year statute of limitations:

> While it may not have been known at the time the 1989 Wickland Settlement was entered into exactly how much the entire remediation efforts would cost, the Settlement's provisions demonstrate that the settling parties agreed to share responsibility for future remediation costs − such as those associated with acid-impacted soils, leaching of metals from the slag, and groundwater contamination. ASARCO's argument that the costs it seeks from defendant in the present dispute are not covered by the 1989 Wickland Agreement is not supported by the record, and defendant's motion must therefore be **GRANTED.**

*See id.* at *9.

On appeal, the Ninth Circuit affirmed the district court's decision, holding that the 1989 settlement triggered the statute of limitations. *See Celanese*, 792 F.3d at 1215. Reviewing the settlement *de novo*, the Ninth Circuit noted that the settlement included an agreement for the parties to "undertake site remediation to investigate, monitor, and abate actual or threatened contamination . . . caused by or related to the conditions at the site addressed by the Remedial Action Plan." *See id.* at 1212. This Remedial Action Plan was based on a report of an environmental consultant, eventually incorporated into the 1989 settlement. *See id.* The court held that "[t]he fact that the full costs were unknown at the time does not mean that the Wickland Agreement was less than comprehensive." *See id.* at 1213.

Earlier, this Court *tentatively* concluded that the response costs and damages sought herein were not "with respect to" the costs covered in the 2007 Settlement. *See generally* MSJ Tentative II. But, the Court has changed its perspective in light of reexamining the parties' arguments, CERCLA, the case law, and the relevant evidence. The 2007 Settlement cast a wide net that includes the costs sought in the 5AC and that are more specifically delineated in the Costs Timeline. That settlement is "comprehensive" like the one in *Celanese*. As discussed above, the 2007 Settlement covers "Regional Response Work," which means "work that the Governments require the Parties, or any one of them to perform, or which they perform at the request or demand of the Governments or any one of them, regarding regional groundwater

contamination alleged to be attributed to the Site." *See id.* § 2.16.  Except for Excluded Matters and certain ministerial tasks, and pursuant to terms and conditions in the 2007 Settlement, OPOG and Omega Chemical PRP Group LLC assumed "each Settling Party's responsibilities for the Site, including, but not limited to, all the response costs associated with the Site." *See id.* 3.01(a).  The Costs Timeline and 5AC fall within those definitions, and, like in *Celanese*, the Costs Timeline includes a mixture of costs known to the parties when they executed the 2007 Settlement and future demands made by regulators.  Though the 2007 Settlement speaks for itself and is sufficient, the testimony of Cohen and the 2004 Cost Estimate Memo solidify and reaffirm that is the case from a practical perspective.  It is also clear to the Court that Plaintiffs have not raised any evidence to create a triable issue of fact as to whether the 2007 Settlement covered OU-2.  Discussed above, Section 2.19 of the 2007 Settlement defines "Site" as "the Omega Chemical Corporation Superfund Site listed on the National Priorities List on January 19, 1999, 64 Fed. Reg. 2945." *See* Doty Decl. Ex. 6A § 2.19.  Also in support of this reading, the 2004 Complaint leading to the 2007 Settlement sought recovery of "costs expended and to be expended by . . . Plaintiff OPOG and its members in response to the releases and/or threatened releases of hazardous substances from the *Omega Site*." *See* Doty Decl. Ex. 18 at 28-29 (emphasis added).  The 2004 Complaint, and the 2007 Settlement that followed, did not limit themselves to costs associated with OU-1 only, but rather they covered the entire Omega Superfund Site, which would inherently include OU-2.  In addition, the 2004 Cost Estimate Memo mentions that the estimated cost for groundwater included multiple sites downgradient from the Omega processing plant and chemicals not connected to the Omega plant.  *See* Doty Decl. Ex. 19 at 20.  The Cohen testimony discussed above also implies that the 2007 Settlement covered OU-2. *See* Doty Decl. Ex. 27 at exhibit stamped pgs. 5-7.

After reviewing Plaintiffs' various arguments, the Court rejects their (at least) three attempts to read additional requirements into CERCLA § 113(g)(3)(B) that are not supported by applicable statutory interpretation.  First, the Court is not convinced by Plaintiffs' argument that the de minimis status of Plaintiffs' generator counter-parties in the 2007 Settlement is dispositive. *See* Pls.' Supp. at 11-14; *see also* Opp'n at 22-25.  Instead, the Court is inclined to agree with Moving Defendants that "[r]ather than focus on *who* settled the cost-recovery action, in short, the statute asks us to focus on *what* was settled." *See RSR Corp. v. Commercial Metals Co.*, 496 F.3d 552, 557 (6th Cir. 2007) (cited in a *Celanese*, 792 F.3d at 1214).  Congress could

have included such a requirement in CERCLA § 113(g)(3)(B), but it did not and the Court is reluctant to read in such a requirement even after considering Plaintiffs' policy arguments to do so.[25]  Plaintiff has not pointed to legislative history that would alter the Court's plain reading and policy considerations do not tip the scale for the Court.  *See generally* Opp'n.

Second, the Court is not convinced that the supposed "contingent" nature of an obligation in the 2007 Settlement would somehow change the fact that the 2007 Settlement is "with respect to" costs sought in the present action.   CERCLA § 113(g)(3)(B) bears no hint of such a requirement.[26]  Plaintiffs cite to no canon of statutory construction that persuades the Court to be the first in this Circuit to carve out such a significant exception.   Though there may be a few legitimate policy concerns, Congress could choose to act if its agrees with Plaintiffs; a plain reading of the statute and the absence of applicable legislative history lead the Court to this conclusion.   The Ninth Circuit in *Celanese* seemed to reject ASARCO's somewhat similar argument "that the phrase 'such costs or damages' in the statute of limitations means that ASARCO's claim for contribution only came about when 'such costs or damages' became

---

[25] The Court applies the following procedure in interpreting CERCLA's statute of limitations provisions, as worded in *Celanese*:

"Statutes of limitations are intended to provide notice to defendants of a claim before the underlying evidence becomes stale." *In re Hanford Nuclear Reservation Litig.,* 534 F.3d 986, 1009 (9th Cir. 2008). A primary canon of statutory interpretation is that the plain language of a statute should be enforced according to its terms, in light of its context. *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997); *Wilshire Westwood Assocs. v. Atl. Richfield Corp.,* 881 F.2d 801, 803 (9th Cir.1989).

When interpreting a statute, our task is to construe what Congress has enacted. We look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy, to ascertain the intent of Congress. We will resort to legislative history, even where the plain language is unambiguous, where the legislative history clearly indicates that Congress meant something other than what it said.

*Carson Harbor Vill.,* 270 F.3d at 877 (internal quotation marks and citations omitted). "Thus, we examine the statute as a whole, including its purpose and various provisions." *Id.* at 880. We construe the statute in context to avoid superfluities. *Cooper Indus.,* 543 U.S. at 166, 125 S.Ct. 577 (citing *Hibbs v. Winn,* 542 U.S. 88, 101, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004)). If possible, we "construe a statute to give every word some operative effect." *Id.* at 167, 125 S.Ct. 577 (citing *United States v. Nordic Vill., Inc.,* 503 U.S. 30, 35–36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992)). "Clearly, neither a logician nor a grammarian will find comfort in the world of CERCLA. It is not our task, however, to clean up the baffling language Congress gave us. . . ." *Carson Harbor Vill.,* 270 F.3d at 883.

*Celanese, 792 F.3d at 1210-11.*

[26] The text of CERCLA § 113(g)(3) is provided on page 7, *supra*.

fixed." *See Celanese* 792 F.3d at 1214. Seemingly disagreeing with that argument, the Ninth Circuit responded that "ASARCO's new contribution claim via the 2008 Bankruptcy Settlement is for exactly the same liability ASARCO assumed in the 1989 Wickland Agreement, and is therefore time barred." *See id.*

Third, the Court is also not convinced that because certain costs were unknown at the time of the 2007 Settlement or because the exact procedure for remediating the Site was not established at the time of the settlement, that somehow the 2007 Settlement does not cover the costs sought herein. Indeed, this Court will respond to those concerns with the words of the Ninth Circuit responding to similar concerns in *Celanese*: "[t]he terms of the [2007 Settlement] clearly define who will pay for the work and the nature of the work to remediate the [] Site, while contemplating that additional tasks may be added to accomplish the remediation's goals."[27] *See Celanese* 792 F.3d at 1213.[28] Upon reviewing the parties' additional briefing, the

---

[27] Here, the situation is also not similar to that in *American Cyanamid v. Capuano*, 381 F.3d 6 (1st Cir. 2004). There, the statute of limitations did not bar a contribution claim because an earlier judgment covered a different set of costs altogether; the later time-barred lawsuit addressed groundwater contamination whereas the earlier judgment addressed soil cleanup. *See id.* at 10-14. At the time of the earlier judgment, regulators had not even assessed whether there was groundwater contamination at the site. *See id.* at 14. That is not the case here, where groundwater contamination is at issue in the present action came into focus as early as 1995. *See* Doty Decl. Ex. 3 at 2:24-3:5. Indeed, groundwater contamination is reference both in the 2007 Settlement and in the present action's 5AC. *See, e.g.*, 2007 Settlement § 2.16; *see also* 5AC ¶ 9.

The Court would similarly find *Whittaker Corp. v. United States*, 825 F.3d 1002 (9th Cir. 2016) distinguishable from this case. In that case, the plaintiff "explicitly alleged" that the costs sought were "separate from" costs covered by the earlier judicially approved settlement at issue. *See id.* at 1005. Unlike here, at issue there was a motion to dismiss, rather than a motion for summary judgment, so that explicit allegation was considered true and dispositive. *See id.* In addition, *Whittaker* did not direclty take on a statute of limitations argument but instead the Ninth Circuit merely determined that the plaintiff was not required to bring a suit for contribution rather than cost recovery because he sought expenses separate from those established or pending. *See id.* at 1010-13. Those questions are "closely related" but they are not necessarily identical. *See id.* at 1010.

[28] For somewhat similar reasons to the Court's conclusions above, the Court would find that a contribution claim arose as early as November 29, 2000 when the United States sued Plaintiff under CERCLA § 107 for cost recovery of response costs and under CERCLA § 106 to compel the clean up of the Omega Site in its entirety. *See generally* 2000 Action Complaint ¶¶ 12-17, Docket No. 785. In addition, the 2004 Complaint against the de minimis generators alleged a contribution claim as the legal basis for the action, seeking contribution for Site costs, indicating that even Plaintiffs must have believed this at one point in time. *See generally* 2004 Complaint, Docket No. 749. As per CERCLA § 113(f)(1), "a person may seek contribution from any other person who is liable or potentially liable under section 9607(a) [CERCLA § 107(a)] of this title, during or following any civil action under section 9606 [CERCLA § 106] of this title or under section 9607(a) [CERCLA § 107(a)] of this title." That statute was satisfied here.

Separate but related, at the August 6, 2018 hearing, Moving Defendants requested that the Court give a "clear ruling" on their judicial estoppel argument. *See* Aug. 6, 2018 Hr. Tr. at 70:23-25. In one sentence and one accompanying footnote in the MSJ, Moving Defendants mention judicial estoppel. There, the extent of their argument is as follows:

Plaintiffs' knowledge of the regional plume issue and their efforts to obtain contribution in

Court also concludes that the statute of limitations provision in CERCLA § 113(g)(3) does not require a party to accept liability or responsibility to trigger the statute of limitations. Plaintiffs point to no legislative history that would indicate otherwise, and the fact that a different provision, CERCLA § 113(f)(3)(B), narrows itself to situations where a person "has ***resolved its liability*** to the United States or a State for some or all of a response action" indicates that Congress purposefully left out such a requirement in CERCLA §113(g)(3). The Court would therefore not read this additional requirement into CERCLA § 113(g)(3).

In sum, the Court would conclude that the 2007 Settlement, which was entered more than three years prior to the filing of the present action, bars the first and third causes of action in the 5AC. The response costs sought here are "with respect to" those covered in the 2007 Settlement.[29] Plaintiffs provide no material evidence to put that conclusion in dispute and thus

---

> connection with their liability for those costs present a fact pattern different from the *Capuano* decision and any claim now that the 2001 settlement did not trigger limitations for the entire Omega Superfund Site would fail by principles of judicial estoppel.

> [FN 12 from the MSJ attached to the end of the above excerpt:] *Samson v. NAMA Holdings, LLC*, 637 F.3d 915, 935 (9th Cir. 2011) provides the Ninth Circuit's three-part framework for judicial estoppel, which Moving Defendants will address if need be in their Reply.

*See* MSJ at 24. In the MSJ Reply, Moving Defendants briefly argue that "judicial estoppel prevents Plaintiffs from claiming that they lacked a CERCLA contribution claim inclusive of OU-2 until recently." Reply at 13-14. Moving Defendants seem to somewhat pivot to arguing that Plaintiffs' actions in the 2004 Action estop Plaintiffs from preferring the aforementioned argument. *See id.* The Ninth Circuit in *Samson* noted four factors that courts consider in deciding whether to apply the doctrine of judicial estoppel:

> Factors relevant in deciding whether to apply the doctrine include: (1) whether the party's later position is "clearly inconsistent" with its earlier position; (2) whether the party has successfully advanced the earlier position, such that judicial acceptance of an inconsistent position in the later proceeding would create a perception that either the first or the second court had been misled; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

> In addition to these factors, the Ninth Circuit examines [4] "whether the party to be estopped acted inadvertently or with any degree of intent."

*See Samson*, 637 F.3d at 935 (citations omitted).

As a separate and independent basis for the Court's decision, it is inclined to agree with Moving Defendants' judicial estoppel position as argued in the Reply. *See* Reply at 13-14. Though there is no evidence of any intent on Plaintiffs' part, Plaintiffs are "clearly inconsistent" with their earlier position in the 2004 Action seeking relief costs inclusive of the entire Site; allowing Plaintiffs to essentially argue that they never had a contribution claim that they litigated before Judge Hatter is an unfair advantage based on an inconsistent position. Moreover, Plaintiffs do not persuade the Court otherwise and they never mention the phrase "judicial estoppel" in the Opposition or any supplemental briefing. *See generally* Opp'n; Pls.' Supp.; Pls.' Supp. II.

[29] In a brief 1.5 page section of the MSJ, Moving Defendants seem to argue that even if the 2007 Settlement did not trigger the statute of limitations to preclude this action, the 2001 CD and the 2010 CD independently

the statute of limitations applies.

## V. <u>Conclusion</u>

For the reasons stated above, the Court would **GRANT** the Moving Defendants' MSJ and **DISMISS WITH PREJUDICE** the first and third causes of action in the 5AC.[30]

---

triggered the statute of limitations. *See* MSJ at 23-25. This section, in its brevity and with its lack of supporting evidence and analysis, does not sufficiently convince the Court that the 2001 CD or the 2010 CD trigger the statute of limitations to run as to this action. Moving Defendants backtracked from invoking the 2001 CD and the 2010 CD in the Reply, asserting that these settlements "[b]oth were clearly identified [in the MSJ] as background support . . . ." *See* Reply at 18. They even include a heading that concedes that "[t]he 2001 and 2010 Consent Decrees Were and Remain Tertiary." *See id.* With the Court determining that the 2007 Settlement bars the first and third causes of action, the Court need not entertain the possibility that those consent decrees (or others) also could have triggered the statute of limitations.

[30] Moving Defendants filed three requests for evidentiary rulings on specified objections as to three separate declarations. *See* Docket Nos. 781, 782, 783. Of those objections, only two objections relate to evidence the Court has relied on in this ruling. Those two objections in Docket No. 783, made against Paragraphs 4 and 6 of the Lucero Declaration, are overruled. Plaintiffs filed one objection, aiming at an exhibit attached to Moving Defendants' Reply. *See* Docket No. 786. The Court did not rely on this exhibit for its ruling and it therefore need not rule on its admissibility. At both of the hearings, neither party made a further request for specific rulings on evidentiary objections.